| 90    487|
| 53a   402|

VANHOOSER v. BERGHOFF, *Appellant.*

1. **Contract** : SURGEON : WARRANT TO CURE. Under the law, the contract of a surgeon is not a warrant to cure one upon whom he operates, but only that he possesses and will use reasonable skill, judgment, and diligence in performing the service, such as is possessed and employed by members of his profession. But it is competent for a surgeon to make a contract expressly binding himself to effect a cure.

2. **Petition** : SURGEON, MALPRACTICE OF. A petition charging a surgeon with malpractice, which alleges that he undertook to reduce and set a bone, and to attend, cure and heal the same, and also alleges that he promised carefully and skillfully to perform said service, but that he carelessly, negligently and unskillfully failed to set, locate and reduce the dislocation and to bind up, dress, and secure the same, taken altogether, does not set out an express promise to cure, but only such an undertaking as the law implies, which is to employ reasonable skill and diligence.

8. **Malpractice** : PRACTICE : EVIDENCE. In an action against a surgeon for malpractice in the improper treatment of a dislocated bone, where the evidence is conflicting as to whether the bone had ever been put in place, or could have been put in place by the exercise of reasonable skill and diligence, the question is one for the jury.

4. ———— : DAMAGES. Where there is a difference of opinion among practical and skillful surgeons as to the practice to be pursued in a

certain class of cases, a surgeon may exercise his own best judgment and employ the treatment his experience has shown him to be best, and a mere error of judgment as to that would not, under the law, make him liable in damages for an injury resulting to his patient.

5. ———: PRACTICE. In an action against a surgeon for malpractice in the treatment of a dislocated bone, it is a question for the jury to determine whether, after it had become manifest to defendant that some appliance was necessary to support the bone in place, he was justified in not using one which had been practically tested and was in common use by the profession, and in adopting in lieu thereof a rude substitute, or whether there was, in this respect, a want of requisite and proper skill and attention ordinarily bestowed in similar cases.

6. ———: EVIDENCE : EXPERTS. In an action against a surgeon for malpractice, where the petition charges defendant both with a want of skill and with negligence, and the plaintiff is allowed to show the skill and reputation of another surgeon to strengthen his diagnosis of the case and give value to the opinions of experts based thereon, the defendant should be allowed to show his own reputation and skill in his profession.

7. ———: ———: BURDEN OF PROOF. In such action the burden of proof is not upon the defendant to show to the satisfaction of the jury that he possessed and used the knowledge, skill, and ability that was reasonably necessary to properly treat the plaintiff.

8. Practice : INSTRUCTIONS. Instructions should not be submitted upon an issue not made by the pleadings.

*Appeal from Buchanan Circuit Court.*—HON. JOSEPH P. GRUBB, Judge.

REVERSED.

*James Limbird* for appellant.

(1) The contract as pleaded, is an entirety, and is an absolute contract to cure. The employment, as alleged, is " to reduce and set the bone ; to attend, to cure, and heal the same ;" that defendant undertook and entered upon said employment, and promised carefully and skillfully to perform the said services. This contract plaintiff failed to prove, and the trial court erred in overruling

defendant's demurrer to evidence for plaintiff, and in refusing instructions number two, five, and nine, asked by defendant. See 1 Greenl. on Evid., sec. 66 ; Philips on Evid., 637, 657 ; 2 Parsons on Cont. [6 Ed.] secs. 520, 521 ; 42 Mich. 100 ; *Galligher v. Thompson,* Wright's Ohio Rep. 466 ; *Reynolds v. Graves,* 3 Wis. 416 ; 77 Ind. 455. (2) The court erred in refusing instructions numbered five and nine, asked by defendant. The verdict was against the law and evidence. (3) The court erred in receiving evidence as to the kind of house plaintiff lived in, and how it was furnished. (4) The court erred in excluding evidence offered by defendant, as to his standing and reputation for skillfulness as a surgeon. See Elwell on Malpractice [4 Ed.] 138, 143 ; McClellan on Malpractice, 244 ; *Leighton v. Sargent,* 7 Foster's Rep. [N. H.] 460 ; *Baker v. Slater ;* Elwell on Malpractice [4 Ed.] 112 ; *Carpenter v. Blake,* 60 Barb. [N. Y.] 488 ; 50 N. Y. Ct. App. 696 ; 17 N. Y. Supreme Court, 358 ; 75 N. Y. 12 ; 31 N. H. 119. (5) There was no evidence to warrant the giving of any of plaintiff's instructions.

*Woodson,. Green & Burnes* and *Ramey & Brown* for respondent.

RAY, J.—On Monday, the sixteenth day of October, 1881, plaintiff fell from a wagon loaded with barrels of apples, one of which rolled on him, and dislocated his left hip. He was at the time several miles from home, and was carried to a neighbor's house, and Dr. Davis called in to see him. Dr. Davis testified that he then "reduced," or set the bone "by manipulation." Whether this is so or not, on the Wednesday following, plaintiff was placed upon a bed and transferred by wagon over rough and frozen roads to his own house. Some time afterwards plaintiff called in Dr. Culver, a neighboring physician, who examined the left hip and

pronounced it dislocated, and advised sending for Dr.
Gough, of Atchison.  After the accident, perhaps some
three weeks, Dr. Gough, accompanied by Dr. Culver and
Dr. Davis, called and examined plaintiff and found the
left hip dislocated, and Dr. Gough, after administering
chloroform, attempted "by manipulation" to put the
dislocated hip in place, but failed.  He then left, as he
was not at that time prepared with the necessary
mechanical appliances to set the bone, and as the
arrangements he demanded about his fee were not made
he did not return.  Thereafter, and on November 14,
Press Vanhooser, the uncle of plaintiff, went with Dr.
Davis to St. Joseph and employed the defendant to come
out and put the bone in place, or to see if it could be
done, for which service he was to receive the sum of
forty dollars.  Plaintiff charges in his petition, objec-
tions to which will be hereafter noticed, and contended
upon the trial, that through the unskillfulness and neg-
ligence of defendant the bone was never properly set, or
that if restored to place the proper means and appli-
ances were not used to keep the bone in place, and that
the result was to make him a cripple for life.  The special
answer of defendant, so far as material, set up a special
contract to reduce the dislocated left hip, and charges
that said service was duly rendered.  The evidence,
or parts of it, the demurrer to the evidence and instruc-
tions will be adverted to in the course of this opinion.
There was a verdict in plaintiff's favor, and judgment
thereon, from which defendant appeals to this court.

The first exception urged upon us is the refusal of
the court to give, at the close of the evidence in plain-
tiff's behalf, an instruction in the nature of a demurrer
to the evidence, which was asked upon the ground that
"the contract as plead is an entirety, and is an absolute
contract to *cure.*"  If this is so, the undertaking is a
special one, and more comprehensive than the law im-
poses on the surgeon.  Under the law his contract is not

one of warranty that a cure will be effected, but only that he possesses and will use reasonable skill, judgment and diligence, such as is ordinarily possessed and employed by members of the same profession. It is, however, competent for the surgeon to make a contract expressly binding himself to cure, and the petition in this case charges that defendant undertook to reduce and set the bone, and to attend, cure, and heal the same, but it also charges that he "promised *carefully* and *skillfully* to perform said service," and that he *carelessly, negligently*, and *unskillfully* failed to set, locate, and reduce the dislocation, and to bind up, dress, and secure the same. Taken altogether we do not think the petition sets out an express promise to cure, but only such an undertaking as the law implies, which is to employ in this behalf reasonable skill and diligence. This view is, we think, supported by the authorities to which we have been referred. *Reynolds v. Graves*, 3 Wis. 416 ; 77 Ind. 455 ; *Grundle v. Rush*, 6 and 7 Ohio, 463.

The instruction was again asked at the close of all the evidence, and the claim made that the evidence shows, without any conflict therein, a fulfillment on the part of defendant of the contract made and entered into with plaintiff. This exception we will now consider and dispose of in this connection. There is little, if any variance, we may observe, in the circumstances and terms of the employment of defendant, as the same is given in the evidence of Press Vanhooser, who testified for plaintiff, and that of Dr. Davis and Dr. Berghoff, examined on the part of defendant. Press Vanhooser, who acted for plaintiff, says, as to this, "I came to St. Joseph with Dr. Davis and went to Dr. Berghoff's office. I asked him what he would take to come out and put the bone in place? He said as it was Dr. Davis' case he would come out and set it for forty dollars. I told him I would give him that * * * . I only hired him to set the bone, to put it in place. No, I didn't employ

him to attend to, to care for, or treat him, only just to set the bone." This, then, was, so far as expressed, the contract of professional service undertaken by defendant. Perhaps the law would imply or attach, if not embraced and covered by these terms, the further duty of properly bandaging the bone, or the use of reasonable skill and care in that behalf. Ordinarily it would also be proper and necessary that the surgeon should also give directions and warnings, such as would be generally given, to enable plaintiff or his nurse and attendant to act intelligently in the further management of the limb. There is evidence to show that defendant gave directions in this behalf, such as to keep plaintiff quiet at first, and subsequently to move the limb gently, as the patient could bear it, to prevent stiffness in the same. But in this case, even if there was no evidence of this sort, it will be perceived that Dr. Davis was first in charge of the case, and was expected to, and did, continue in attendance as plaintiff's physician for some time afterwards, and directions might properly be given to him, which both Dr. Davis and defendant say was done, and his judgment and skill could properly be and was, perhaps, relied on as to directions and after treatment of the case.

When defendant called on plaintiff, which he did on November 16, the second day after his said employment on November 14, after learning from plaintiff the history of the accident, which had also been previously given him by Dr. Davis, he placed plaintiff on the floor after administering chloroform, tried to set the bone by manipulation, but failed to set it by this means just as Dr. Gough had failed in his said endeavors so to do. He then employed pulleys and the Jarvis adjuster, which were the proper mechanical means, and after some three hours work succeeded, with the assistance of Dr. Davis, as both doctors testified, in reducing the dislocation. The bone, however, did not move back into

place with a "snap," which, it seems, is one of the recognized signs of success in such operations, but this is accounted for by the physicians in attendance at the time by the fact that the dislocation was an old one of some thirty odd days standing at the time, and the cavity may have been filled or partially filled by plastic or some solid material at the time. But however this may have been, the plaintiff himself testifies that when he came from under the influence of the chloroform, the defendant, who claimed the leg was then all right, "moved it up and down, in and out, and sideways, which couldn't be done before." Press Vanhooser, upon this showing, paid the forty dollars as he had agreed to do. Defendant, at this time discovered, as he claimed, that plaintiff's right hip also was dislocated, but as plaintiff was then believed to be too much exhausted to permit the attempt at that time to put the right hip in place, arrangements were then made for defendant to come back at a subsequent day and reduce the dislocation of the right hip. Ten or twelve days thereafter defendant returned for this purpose, and was accompanied on this visit by Dr. Davis and also by Dr. Magar. At this second visit plaintiff testified that all three of said doctors in turn took hold of his left leg, moved it up and down, in and out, and sideways. All three physicians testified that they rotated the limb delicately but firmly, and that the bone was then in place and all right. When the limb can be extended and thus rotated freely, this is said, ordinarily, to be sufficient evidence that the bones are in place. Immediate relief from pain, it seems, is also one of the recognized signs that the operation has been successfully performed. In view of this fact the statement which the plaintiff makes, among others, that his left leg "quit hurting him after the defendant put it in place, until a few days after he put the right hip in place" is, to say the least, very significant. Upon the occasion of said second visit the defendant and

his assistants again administered choloroform and operated upon the right hip of plaintiff. We omit the controversy as to whether the right hip was dislocated or not, and the evidence upon that subject, as the same is wholly irrelevant and immaterial in this action. After said operation upon the right hip, the legs were tied or bound together and pillows placed under them and defendant left, leaving the patient in the care of Dr. Davis. Some three or four days after this, and some sixteen or seventeen days after defendant had set or operated upon the left hip, the uncle of plaintiff discovered that the left leg didn't look right, the knee being drawn up and over and the heel turned out and the toes in. On December 7, Dr. Davis sent for defendant again, and he went down on the next day to see the plaintiff for the third time, and upon examination said that the left hip was again out of place, but the weather was extremely cold, and as the patient would have to be placed before the open door for the operation, the windows being boarded up, it was decided to be imprudent to attempt the operation at that time.

About ten days afterwards defendant returned for his fourth visit, and with Dr. Davis again put the left hip bone in place, as they testified, and then left. After this nothing was ever done by plaintiff, who never again notified or sent for defendant, or employed any other doctor, but as he testified, just let it go, with the result already indicated, the right hip being sound in all respects and the left one being firmly fixed in its malposition.

This evidence, it must be confessed, presents the case very favorably for the defendant, and is, to say the least of it, of great force and weight. We may observe that we have not been favored with any additional abstract or brief, or with any oral argument in behalf of the respondent, but the evidence in the record, which we suppose is relied on as of a contrary tendency, is in

substance about as follows : Dr. Gough, whose reputation as a skilled surgeon is shown to be of high order, it will be remembered, was called to see plaintiff a week or more, perhaps, before defendant was employed. He testified that he thought that, by the use of the proper appliances, and the exercise of ordinary skill on the part of the surgeon, the bone of the left hip could have been reduced and a good limb secured, and that such would have been the ordinary and probable result of proper treatment. He examined the plaintiff before giving his deposition in the cause, and gave it as his opinion, from his two said examinations, that the dislocation of the left hip bone had never been reduced. Dr. Geiger and a number of other physicians and surgeons, upon the assumption that Dr. Gough's diagnosis was correct, and upon the testimony given in the cause, gave it as their opinion that the dislocation had never been reduced. Some of these also further testified that if the bone had been put in place and remained so for twelve days, it would require a great deal of violence to again dislocate it, and that in their opinion it could not redislocate itself, or be redislocated by the patient in bed by any use or exercise of his body. The testimony of others, however, was just to the contrary in this respect.

The testimony of plaintiff and his wife and attendants tends to show that the directions given by defendant were followed, and that the plaintiff remained quiet in bed, and that when unbandaged his left hip was found in the same condition and still out of place. One or more of these described the left leg before defendant came to treat it, "as turned in somehow," and says that after defendant left it remained "very much the same." These features in the evidence, taken altogether, tend, we think, somewhat to show that the bone had never been set or put in place ; that it might have been so set by the exercise of reasonable skill and diligence, and

are sufficient, as we are inclined to believe, to create a substantial conflict in the evidence, and to take the issue to the jury. After the dislocation had been reduced the surgeons testifying in the cause disagree as to the necessity of employing splints or other appliances ordinarily to retain the bone in place. Dr. Gough, for example, testified that he would have extended the limb and "applied a long splint on the outer aspect of the leg," whilst Dr. Malin, another expert introduced by plaintiff, testified that his practice was "to extend the limbs and tie the legs together without any splints." An authority upon this subject, to which, among others, we have been referred, says that "dislocations as a rule are characterized by preternatural immobility, and when reduced do not need support to retain the bone in position." McClellan's Malpractice, 410. If this is so, and if there is, as seems to be the case, a want of definite and prescribed mode or system of treating the joint after the bone is set, and differences among practical and skillful surgeons in this behalf, the surgeon may, we think, exercise his own best judgment, employing the methods his experience has shown him to be the best, and a mere error of judgment as to this would not, under the law, make him liable in damages.

But the authority already quoted further says: "Sometimes, however, after the reduction, the bone has a tendency to redislocation, and will not remain in place without support." There was, manifestly, such a tendency to redislocation in this case, and recognizing this, defendant, when he re-set the leg, tied the legs of plaintiff together, and wrapped up a small stick of stove wood in a blanket and placed the same under or against the left hip, which was intended, perhaps, to act to some extent as the splint would, and in lieu thereof. A further circumstance shown by the evidence is, that after defendant had re-set the left leg, at the time of his last visit, some of those attending plaintiff discovered, im-

mediately after defendant left, something wrong with the leg, as they thought, as the foot seemed to be slipping down out of bed, and went after him and brought him back. Defendant thereupon, before leaving, put a plank between the leg and the bed-rail, to obviate this difficulty. Whether the defendant, after it had thus become manifest to him that some means or appliances were necessary to support and hold the dislocated bone in place, was justified in not using the "splint, which had been practically tested and was in common use in such cases by the profession," and in adopting, in lieu thereof, the rude substitute mentioned, and in using the same in the manner stated, or whether there was, in this behalf, a want of the requisite and proper skill and attention ordinarily bestowed in similar cases, was, we think, also a question for the jury, and we so hold.

But there were a number of other exceptions taken upon the trial, and among them the following : Plaintiff was permitted to show the skill, reputation and standing of Dr. Gough, as a surgeon and physician, by the testimony of the medical experts, who were then asked, and permitted to give, their said opinions upon the material issues, on the assumption that his diagnosis of the case was correct. After this proof was admitted in plaintiff's behalf, the defendant, in his turn, offered to show, by the same experts and witnesses, his own skillfulness and reputation in that behalf, which evidence so offered was, on objection of plaintiff, excluded. It will be perceived and remembered that the petition charged defendant, both with a want of skill and with negligence in the treatment of the case. The possession or want of skill by defendant was thus made a material issue, and plaintiff was not limited, either in his pleadings or by the instructions in the cause, to the issue of negligence. The possession of the required skill by defendant, if he did not apply or use it in the case, would,

it is true, be no protection, but it would make the lia-
bility depend upon the question of negligence merely,
and, where both issues are thus tendered and submitted
together, we are not disposed to hold that it is imma-
terial whether the defendant is, or is not, reputed to be,
and is, or is not, a skillful surgeon.  In *Leighton v.
Sargent*, 7 Foster [N. H.] 475, as in the case at bar, the
defendant was charged with both a want of skill and
with neglect in the treatment of the plaintiff, and simi-
lar evidence was there offered and excluded.  The court
observes that nothing in the declaration confined plain-
tiff to either of these views, and " nothing had occurred
in the course of the trial to restrict the plaintiff to the
point of negligence.  He was, therefore, at liberty to
take his position before the jury that defendant was ig-
norant and unskillful, or that he was negligent and care-
less, or, if he so pleased, that he was both unskillful
and negligent.  Any evidence, then, calculated to repel
the inference of ignorance and unskillfulness, to show
that he was a man of suitable education and acquire-
ments for the safe practice of his profession, must surely
be competent and proper.  Such evidence must change
the whole position of the case before the jury, because, if
the jury were satisfied he had proper knowledge and skill,
the only question must then be, whether he had adopted
the course of his treatment from mistake, mere error of
judgment, or from negligence and a want of ordinary
care.  This, it is obvious, presents a very different state
of the question from that where the points of ignorance,
negligence and error are to be considered.  As the evi-
dence in question seems to us both pertinent and mate-
rial, as tending to show ordinary knowledge and skill,
we are satisfied it should have been received."

The experts whose testimony was offered in this behalf
were, we may remark, personally acquainted with defend-
ant, and some of them, at least, had been associated with
him in practice in similar cases, and it was, we think, and

so hold, competent to prove by such witnesses thus qualified to testify, whether defendant was or was not a skillful surgeon. The admission of similar evidence as to the skill and reputation of Dr. Gough manifestly would strengthen his diagnosis of the case and give value to the opinions of the experts based thereon, and this, we think, rendered it all the more proper and necessary that the jury should have the same proof as to the skill of defendant in considering his diagnosis and treatment of the case.

As already said, the issue as to the skillfulness of defendant was submitted, with the other issue as to negligence, in the instructions given in the cause, but competent evidence in that behalf was, we think, under the said ruling, excluded, and this, we think, was error, and we so hold. Exceptions were also taken to the court's action and ruling upon the instructions, and one of these, we think, is well taken. The fifth given in plaintiff's behalf, seems to put the burden of proof upon defendant to show to the satisfaction of the jury that he possessed and used the knowledge, skill and ability that was reasonably necessary to properly treat plaintiff. If it is open or subject to this construction, as we think it is, it is out of harmony with other instructions given in the cause and is manifestly erroneous.

As the cause goes back for re-hearing, we deem it proper to add that instructions numbered four and seven, given at defendant's instance, unnecessarily and improperly include the treatment of plaintiff's right hip by defendant, as to which there is no issue or claim made for damages. All concur.