# ELSIE E GOTTSCHALL, Respondent, v. JACOB GEIGER, Appellant.

### Kansas City Court of Appeals, May 2, 1921.

1. **WITNESSES: Husband and Wife: Husband Competent Witness in Wife's Lawsuit Where Made so by Statute.** At common law, the husband was not a competent witness in his wife's lawsuit, and he is, therefore, only a competent witness where made so, by section 5415, Revised Statutes 1919, which removed the disqualification of the husband to testify as a witness in his wife's suit when such suit or proceeding is based upon, grows out of, or is connected with, any matter of business or transaction had with or conducted by the husband as agent for his wife, and, perhaps, in a few other limited instances.

2. ————: ————: **Evidence: Husband's Testimony Inadmissible in Wife's Action Against Physician for Malpractice.** In a suit by wife against a physician for negligently diagnosing condition and in advising and deciding upon a surgical operation for removal of a tumor, where upon performing operation it was found that pregnancy, and not a tumor, was the cause of her trouble, testimony of husband, who had been consulted about one operation and witnessed another, was inadmissible under section 5415, Revised Statutes 1919, making husband's testimony competent, when the proceeding is based upon, grows out of, or is connected with, business or transaction had with and conducted by husband, as agent for his wife, as the basis of the suit was not with regard to the manner of performance of the operation or extent thereof, but for negligently diagnosing plaintiff's condition and in deciding to perform the operation.

3. **PHYSICIANS AND SURGEONS: Malpractice: Negligence: Mistake in Diagnosis: Burden on Plaintiff to Show not only Mistake in Diagnosis, But That Such was a Negligent Mistake Rendering Operation Unnecessary.** The burden is on patient to show not only that physician made a mistake in diagnosing her condition and in deciding upon and advising a second operation, but patient must also show that such was a negligent mistake and that the operation was so palpably unnecessary that a surgeon of ordinary care and prudence would not have advised nor undertaken it.

4. ————: ————: ————: **Negligence of Surgeon in Making Diagnosis and Advising Operation Determined in Light of Conditions Existing**

Gottschall v. Geiger.

**Prior Thereto.** The question of whether surgeon was negligent in making diagnosis and in deciding upon an operation must be determined in the light of conditions as they existed before the operation was performed.

5. ———: ———: ———: **Surgeon Making Mistake in Diagnosis, Not Liable for Honest Exercise of Best Judgment.** Where conditions are such as to lead a surgeon of ordinary care and skill to think that patient was not pregnant, or even that as a remote possibility, patient might be and yet an operation was necessary, and surgeon in the honest exercise of his best judgment thought an operation was proper, the surgeon would not be liable even though it afterward turned out that surgeon was mistaken in diagnosing patient's condition.

6. ———: ———: ———: **Evidence: Expert Testimony: Whether Surgeon's Decision to Operate Negligence Determined by Testimony of Experts.** Where there are conditions existing such as to raise a question whether an operation is advisable or proper, the question of whether surgeon's decision to operate is negligent or not, should be gathered from opinions and testimony of those who have special knowledge and are qualified to speak on such matters.

7. ———: ———: ———: **Negligence of Physician in Advising Unnecessary Operation, Question for Jury.** In an action for malpractice by a married woman against a surgeon where there was a question as to whether surgeon made as full and exhaustive an examination as he should have done before deciding to operate, and whether surgeon did not carelessly assume that patient was suffering from a tumor, when, as a matter of fact, patient was merely pregnant and no operation was necessary, the question of whether there was negligence on the part of the surgeon was for the jury.

Appeal from the Circuit of Buchanan County.—*Hon. Lawrence A. Vories,* Judge.

REVERSED AND REMANDED.

*Randolph & Randolph* for respondent.

*R. A. Brown, R. L. Douglas, Wm. E. Stringfellow,* and *Strop & Mayer* for appellant.

TRIMBLE, P. J.—This is an action for damages on account of alleged negligent malpractice. The plaintiff is a farmer's wife, about 33 years of age, living in De-Kalb county. Defendant is a physician and surgeon, of 51 years' practice, in St. Joseph, Missouri, who formerly held the chair of surgery in Ensworth Medical College and in St. Louis University, and who is now dean of the first named institution. He is unquestionably of high repute and standing in his profession, and there is no charge of a lack of the requisite qualifications of knowledge, skill, training or experience on his part. The gist of the cause of action submitted is that defendant was *negligent in diagnosing plaintiff's condition* and *in advising and deciding upon* a surgical operation which he undertook to perform on plaintiff, but, upon opening her abdomen, found that *pregnancy,* and not a tumor, was the cause of her trouble. There was no charge or complaint of any negligence in the *manner of performing the operation.* A trial was had, resulting in a verdict and judgment for plaintiff in the sum of $3000 from which defendant has apealed.

In April, 1918, plaintiff was the mother of two children, one ten and the other two-and-one-half years old, and up to the last day of May in that year, she was strong and well, able to do the work of a housewife and of assisting her husband in certain of the farm work. On the last named date, however, she became sick, and, upon examination by her family physician, Dr. Clark, he said she had "some involvement of gall bladder." Plaintiff, about the last of July went to defendant in St. Joseph where he diagnosed her trouble as appendicitis, and where he, on August 1, 1918, performed an operation on her for that disease and also, he says, for ovarian trouble which he says he suspected. According to defendant's testimony (and there is no evidence to the contrary), when he performed this operation he found a long, large, highly inflamed appendix. He further found that the right tube, broad ligament and ovary and all parts lying in close proximity thereto were inflamed, that

the omentum, or apron that lies over the bowels, was grown fast to the inflamed mass in the right side; that he loosened this, removed the appendix, the right tube, right ovary and broad ligament because they were all diseased and highly inflamed. The left ovary was also cystic and he says he removed about seven-eighths of it, leaving a small healthy portion of that ovary. (The evidence of all the medical experts is that the common and proper practice, in removing the ovaries, is to leave a small portion of one ovary, if possible, since that will help to hinder or prevent nervousness and other untoward effects which will be certain to arise if the whole of both ovaries is removed.) Defendant testified that he also, in this operation of August 1, 1918, found a double tear of the womb produced by her former confinements, and that he sewed up these rents and scraped the womb.

It is agreed on all sides that from this operation plaintiff rapidly recovered, leaving the hospital and going home on the 11th of August, 1918; and plaintiff says that thereafter she was as well and strong as she ever was.

While some vague complaint of this operation seems to be made in the petition, yet, as submitted, the case does not rest upon any cause of action growing out of this operation, but upon the defendant's advising and deciding upon a second operation performed in May, 1919, as the matters hereinafter stated will more fully disclose.

According to plaintiff's evidence, the defendant told her, after the first operation, that owing to the removal of her ovaries, she could never bear children, that it would be an impossibility. However, along in December, 1918, she says she began to think she was pregnant, and about January 1, 1919, she sent her husband to the defendant telling him of her symptoms, and the defendant sent back word that if she didn't get better she had better come in and let him see her. On April 26, 1919, she did so. She says he asked her what the trouble was and she told him it was in her stomach; that he placed her on the examining table and pressed across

her abdomen and said she was in the "family way;" that she replied she thought she was, but that he had told her when she was operated on in August that she could not get that way; that he then asked what the operation was and said he had so many he could not remember them unless he looked up his records. He referred to his records and said she couldn't be in a family way, his records showed he had removed her ovaries. Plaintiff says he then "pressed across the abdomen quite a little bit and said it was a tumerous growth," that she would have to have it removed right away as they grew very rapidly. Plaintiff told him, so she says, that she thought she was in the family way and that it could'nt be anything else, and upon defendant asking her why she thought that, she told him "the movement was so strong" and she had every symptom she had before with her other two children; that defendant thereupon said it was not that, it couldn't be, and that if plaintiff could not stay at that time to have an operation, she must come back right away and have it done, she mustn't wait over two weeks as they (the "tumerous growths") grew very rapidly. She also says he told her he couldn't "determine just where the tumor was" and would have an X-ray examination to find out.

Plaintiff says she waited three weeks, however, and came back on May 19, 1919, for the operation; that defendant examined her again in the same maner and told her to go to the hospital that evening; that it was a tumor, that they grew rapidly and it must be removed right away. She says that after the examination, her husband asked defendant if he were not going to use the X-ray and defendant replied no, that it would cost her $15 and he didn't think he could tell. Plaintiff says she told defendant she still thought she was pregnant, but that defendant said no it was not that, it couldn't be that, and to dismiss it from her mind.

The next morning, May 20, 1919, she was placed on the operating table, and an anæsthetic was administered, and an incision about six inches long was made in the

abdomen about on, or little to the right of, the median line and below the navel. The doctor put his hand into the opening, felt around and found that plaintiff was pregnant. (The doctor says he found the womb bound down by adhesions, which he removed, restoring the womb to its normal position.) Plaintiff was then sewed up, and on the 8th day thereafter left the hospital and went to the home of a relative in the city where she stayed three days and then went to her home. On the 19th day of July thereafter she gave birth to a 9-pound healthy baby boy, fully developed and, according to Dr. Clark the physician who attended her, one that had gone the full nine months' period. It was in good health and thriving at the time of the trial.

Plaintiff claims that as a result of her second operation she has become nervous and weak. She doesn't have any pain whatever, but feels extremely weak, nervous, and has spells of severe headache. These nervous spells come on about every week or ten days; when she tries to do her work they will come on in an instant and she has to go to bed. She had to wear a bandage about her abdomen after the second operation until her baby was born; and during that period she suffered pain from the incision that was made, but the incision healed up about a week before the child was born. All that plaintiff complained of at the time of the trial was that she was extremely weak and nervous and possibly the attacks of headache above mentioned. During the time between the second operation and the birth of the child, she worried over the latter, fearing the effects of the incision that had been made in her abdomen.

According to the evidence of Mr. and Mrs. Brink, neighbors of plaintiff, they were at the hospital in June after the operation and before the baby was born and talked to defendant, and, according to them, Mrs. Brink asked defendant if it would have been necessary to operate if he had used the X-ray and he replied "No, I probably made a mistake; in fact I know I made a mistake." Mrs. Brink didn't understand him to say he made

a mistake in not using the X-ray, but supposed he meant he made a mistake in operating. Mr. Brink says defendant said "Probably not" when asked would it have been necessary to operate if he had used the X-ray and that he also said "I probably made a mistake—in fact I know I did," and that he further said "I only know of one other case like it,"

The defendant testified that after the first operation, the plaintiff came to him in April, 1919, complaining that she was not getting along well, that her stomach pained her, that she as nervous and constipated, had a dragging down feeling in her abdomen and said there was a lump there. Defendant says he looked up the record of her previous operation and made a bi-manual examination, having one hand on the abdomen and the other in the vagina; that he found a mass to the right of the median line, the principal part of which was *immovable,* but the lower part was not; that the neck of the womb was turned to the left high up; that he could not make out what the mass was and told her he didn't know what it was, it might be a tumor, that there was something growing there, and that she might have to have an X-ray examination. Defendant says he told her maybe they had better wait a couple of months and at the end of that time he could tell better what it was; that in three or four weeks she came back saying she couldn't get along any more, the pulling, dragging and burning in her stomach and her nervousness was so great that something had to be done. The doctor says he again examined her and told her he didn't know what it was, it acted more like a tumor than anything else, and that "nothing short of an exploratory operation, nothing short of an operation, is going to relieve you, and I advise you to go to the hospital and let us find out what is the matter and try to relieve you." He says he had in mind at that time, three things one of which might be the matter with her, namely, first, an intermural fibroid tumor, which sometimes grows very rapidly, second, a sarcoma of the womb, or, third, pos-

sibly pregnancy. The defendant says he did not wholly exclude pregnancy as one of the possible conditions, but that he placed it last in the scale of possibilities because it was *very unusual* for a woman, with only a small portion of one ovary left, to become pregnant; but the main thing was her complaining and the fact that the womb was turned to one side and *immovable,* not entirely so, but it was fastened down and was tender; that he knew there was some pathological or abnormal condition there but just what it was he did not know further than this, that as a result of what was done at the former operation there necessarily would be some "adhesions" (i. e. places where different parts lying against each other, where they were raw or inflamed, had, upon healing, grown together); that the position of the womb in turning to one side instead of rising up in the abdomen along the median line, indicated that it was held down by adhesions; that he could have inserted a "sound," a metallic instrument, into the womb and determined its depth thereby, since the womb is deeper and longer if it contained a fibroid tumor, but if he had inserted a sound and the patient was pregnant it would almost invariably have produced an abortion; that where there is a tumor and no adhesions you can move the mass, a pregnant womb is also more freely movable unless it is bound down, but a womb with a tumor in it and having adhesions becomes immovable. Defendant further testified that whenever the womb of a pregnant woman is bound down by adhesions, the womb cannot develop to the full extent, and pain follows and vomiting, indigestion, etc., and abortion or premature delivery may take place at any time. He further testified as to the difficulty in determining whether pregnancy or some other condition existed; that so called "kicking" or movements felt in the body were unreliable as indications of pregnancy, there being so many movements in the belly, for instance, peristalsis of the intestines, which in case of constipation as the plaintiff had, would cause great muscular movement in the abdomen; that these move-

ments had often been felt by women who it afterward turned out had never been pregnant; that there was no way by which he could absolutely and positively have told whether plaintiff was pregnant except by introducing the sound which, as stated, would have brought on an abortion if pregnancy did exist.

Defendant further testified that owing to the condition and position he found the womb in and the other symptoms heretofore referred to, the proper course was to open the abdomen, and, if the mass was a tumor, to remove it, but if only pregnancy existed, to remove the adhesions so the womb could resume its natural position and develop properly as the child grew, and thus not only remove the condition giving rise to the unpleasent symptoms, but also avoid the danger of abortion or premature delivery and perhaps save the life of the mother as well as that of the child itself.

Defendant says that for this purpose, and with this end in view, he made an outside cut in the outer wall of the abdomen somewhat larger than the one in the inside wall or through the muscles and the peritoneum, the latter cut being about two-and-one half inches in length, and through this opening he found, on examination, that the womb was firmly bound down on the right side to the pelvic fascia, or the lining on the inside of the hip, which gave rise to plaintiff's pain, sick stomach and constipation; that the womb was lying, not transversely, but very obliquely, so that it could not rise up in the abdomen without pulling and giving rise to disturbances. The omentum was found to be again adhered and bound down. Defendant says he put in his fingers and loosened the adhesions as far as he could and, finding some so large and tough that he could not separate them with his fingers, he inserted a pair of scissors and snipped them loose, allowing the womb to resume its natural position. He says the womb was not large and he thought the child therein was some four or five months along. He said that the plaintiff might possibly have gone on

207 Mo. App.—7

and had the child without the operation of loosening these adhesions but not in his judgment; that if it had not been done it is his opinion that she would ultimately have had an abortion and lost her child; that had he known at the time she was pregnant he would have done just what he did do; that in addition to the womb lying obliquely and being bound down on the right side, the neck thereof was turned almost to the left, that such position of the womb made childbirth very difficult; that in his opinion the second operation benefited plaintiff and probably saved the child's life, and there was nothing about the operation which could have produced the condition of weakness and nervousness of which plaintiff complained at the trial. The defendant admitted talking to Mr. and Mrs. Brink about the case, but denied answering in the way they said he did; that he did say he didn't know wht the trouble was and that it was a very unusual case, but that he never said he made a mistake in performing the second operation; that he didn't say such was a mistake because he did not know fully the condition and it was not a normal pregnancy and could not be, after the big operation she had had in August before; and that he made no mistake in determining upon the second operation.

The records of the hospital showed that after the operation complained of the patient slept well every night, rested well every day, and on May 28, 1919, was discharged from the hospital in good condition.

The only medical witness plaintiff offered was her family physician, Dr. Clark of Maysville, who testified that at the trial plaintiff "seems very nervous and irritable and seems to have lost considerable weight," but that she was not nervous and irritable during the years he knew her before defendant operated on her. Whether he meant the first or second operation does not appear. When he was asked by plaintiff's counsel whether pregnancy at seven months (the stage plaintiff claims the pregnancy had reached at the time of the second operation), was a difficult thing to determine

in an examination, Dr. Clark replied "That is a very difficult question to answer; it depends on who it is and the conditions and the patient." He said, however, that *ordinarily* it is not. Plaintiff then asked her medical expert the hypothetical question, assuming that plaintiff was 7 months along in pregnancy and was giving an anaesthetic and her abdomen opened, under the supposition that she had a tumor, by a surgeon who then found she was pregnant, and she was then sewed up and had to wear a bandage for the remaining period of her pregnancy, whether or not the anaesthetic, the wounding and the subsequent condition that followed it, "would account for her present condition?" The doctor attempted to reply and said, "A. That is beyond my—" when plaintiff's counsel broke in with another question and the following took place:

"Q. Would that probably account for it? A. I wouldn't attempt to answer that question.

"Q. What do you say is the cause of her present condition? A. I don't know.

"Q. Would such a wound and the anaesthetic under the circumstances I have mentioned be likely or probable to produce a nervous condition of that kind? A. Well, now, I would say that the accompanying distress and worry she has gone through with it would.

"Q. That it would with the accompanying distress? A. Yes, sir.

"Q. Do you know any other cause for her condition except that? A. No.

"Q. You know of no other cause? A. No."

Plaintiff's medicial witness further testified that in an operation for appendicitis and for removal of the ovaries, adhesions will always follow if there has been infection; that adhesions resulted from infection or irritation; that adhesions all around in the region of the infected place and of the appendix might involve the ovaries; that whether a woman could carry a child to 7 months with the womb adhered to the walls of the abdomen would all depend on the *extent* and cause of

the adhesions; that in his opinion, if the womb adhered to the walls of the abdomen and was held down by them the foetus wouldn't grow, and in that event probably an abortion would take place; that the womb enlarges as pregnancy advances and rises higher, but the adhesions might become elastic and follow the womb, in which case they would cause pain; that even if the adhesions became elastic and gave or stretched as the womb enlarged, they might cause a miscarriage, depending upon the amount of binding on the womb and the irritation thereto caused thereby; in other words, adhesions might cause an abortion in one case and not in another depending on the extent thereof; that if the movement of the womb was limited and restricted or bound down in some way, there was some pathological condition; that if there were adhesions arising from the infection and former operation they would cause pain and unusual nausea, and an operation relieving the adhesions might be a proper thing to do depending greatly on the woman's personal knowledge or appearance, and the surgeon who has the case in charge is the better judge of what should be done. He also said that a very small portion of the ovary, a piece as large as a bean, if left, could function so as to produce the ovum resulting in pregnancy if impregnated by the male germ.

On behalf of the defendant, the following witnesses testified: Miss Bailey, the nurse who was present at the second operation, says the plaintiff when brought in to be operated on "seemed real sick to me," she was vomiting and seemed to be very sore and tender in the abdomen whenever they moved her, and she had to be lifted on to the operating table; that before the operation the defendant said he didn't know what he was going to find, he had a mass of some sort, he didn't know what is was, that he thought it was a tumor but he didn't know; that the doctor, after opening the plaintiff's abdomen, said she was pregnant, that witness saw him pull loose adhesions and use his scissors in cutting other of the adhesions loose; and that the operation was

completed promptly without the doctor leaving the patient or the room and that the patient progressed very nicely after that.

Dr. Bergher, a physician who happened to be at the hospital at the time, but who was not connected with it or the defendant, came into the operating room just as the operation was about to begin. He says he asked the defendant what he had—i. e.,- what was the trouble with the patient—and the defendant said, "That is what I am trying to find out." Witness also said he saw the defendant make the incision and open the abdomen, that he put in his hand and said, "This woman is pregnant" and then loosened the adhesions with his fingers and cut others with his scissors; that the defendant did not to his knowledge go out of the room during the course of the operation, though the witness did not remain in the room until the patient was removed.

In support of the correctness of the defendant's theory and the surgical course he pursued in plaintiff's case, the defendant introduced nine physicians and surgeons of thorough knowledge and long experience in surgery and obstetrics. Of these, Dr. Thompson, a practitioner of medicine, surgery and obstetrics for 32 years during which time he had had experience with over 1800 obstetrical cases, testified that it was a very rare occurrence for a woman with only one-eighth of an ovary to become pregnant, that under the conditions specified in this case he would not have expected to find pregnancy; that the conditions found at the first operation always result in adhersions being formed; that adhesions to any part of the womb at any time during pregnancy will interfere with it; that the chances are that with the womb bound by adhesions as stated, the child would not have lived and both mother and child would have run a greater risk of death if the operation had not been performed; that it is not always possible to positively diagnose pregnancy at seven months, sometimes it can't be done, he had seen the best experts in America fail on it; that in this case it wouldn't have been

possible to definitely diagnose this case as one of pregnancy, that in pregnancy the enlargement is on the median line, and when the mass is aside from the median line the strong indications are that it is a tumor; that where the womb is bound by adhesions the experiment known as "ballottement" will not disclose pregnancy; that under the conditions, the second operation was one which a physician and surgeon of reasonable care and skill in similar communities would have performed even if the condition of pregnancy were absolutely known; that the pregnancy in this case was not a normal one.

The testimony of the other experts were to the same effect, namely, that under the conditions named, pregnancy is very difficult to positively diagnose; that it is very rare for a woman, with only a fragment of one ovary, to have children, and pregnancy would be considered very improbable under such circumstances; that vomiting after third or fourth month indicates a toxic or poisoned condition of some kind; that they would not have diagnosed plaintiff's case as pregnancy; that adhesions follow an infection and operation such as plaintiff had the first time, that they interfere with pregnancy and any abnormal pregnancy is difficult to diagnose; that the X-ray is not commonly used to diagnose pregnancy, it will not disclose the foetus at seven months and is not reliable even at eight months; that the use of the stethoscope will not always reveal the heart beat of the foetus; that the second operation was a proper one such as an ordinarily skillful and careful surgeon of that community would have performed; that if it had not been performed, plaintiff's condition would probably have resulted in the loss of the child.

One of these experts, Dr. Byrne, testified that *abnormal* pregnancy is one of the most difficult conditions to diagnose physicians have to meet, that he had seen Dr. Murphy of Chicago, one of the world's greatest surgeons, open a woman's abdomen exposing a large womb and after examining it carefully, was still unable to say whether she was pregnant or not; that he had seen Dr. An-

drews, another surgeon of wide reputation, open a woman's abdomen and remain uncertain whether she was pregnant or not though he decided to act on the assumption that she was about six months along.

The medical testimony of these experts was also to the effect that there is no reason why the second operation should have affected the plaintiff's general health and produced the symptoms complained of by her at the time of the trial, that the use of an anæsthetic does not injure a pregnant woman, that women are sometimes nervous wrecks following a childbirth which is apparently normal; that nervousness always results from the removal of the ovaries. Dr. C. R. Woodson testified that the operation was justifiable and proper under the circumstances named in defendant's hypothetical question, since if the adhesions had not been removed, the chances are that the plaintiff would have miscarried or the womb bound down so as to prevent the child from turning and thereby make delivery very difficult resulting in the death of the child; that so far from the second operation producing great nervousness and extreme weakness ten months or a year after the operation, it should have prevented nervousness and would benefit the patient, and evidently did so as she gave birth to a healthy normal child.

In setting forth the evidence offered by plaintiff in support of her case, we have heretofore purposely omitted the testimony of her husband which was introduced over the objections of defendant. We have done this because, in our view, the husband's testimony was not admissible and, therefore, the question of whether plaintiff had sufficient evidence to go to the jury should be determined, from all the evidence and lawful inferences in her favor, without regard to the husband's testimony. The admission of the husband's evidence came about in this way:

Plaintiff testified in her first direct examination that her husband was present in the operating room at the first operation at her request because, she says, "I wanted him to see what was done." Later on she was

asked by her counsel "When the second operation was performed state whether or not you requested and directed that any person be present to *represent you at that operation?*" She answered, "Yes, sir; I asked my husband to." And again, in reply to the question of her counsel relative to the second operation, "At the time the anæsthetic was administered was your husband there present at your request?" she said "A. When I left the room I requested him to go with me, and he was right at my side when they gave the medicine."

Thereafter the husband was introduced as a witness but the court would not let him testify concerning either the first or second operation, but did allow him to testify as to the message defendant sent back to plaintiff when she first sent her husband to see the doctor in January as has been heretofore stated. Thereafter plaintiff was recalled and was asked: "Q. When your husband came with you to this first operation did you—for what purpose did you have him there,—did you give him and directions what to do or anything?" And she replied "A. I asked him to go to the operating room and stay through the operation and see what was done."

"Q. Was that all you said to him? A. Yes, I think it was."

And as to the second operation, she said "I asked him to go along and see what was done."

"Q. That was all there was to it? A. Yes."

After the defense had closed in chief and after plaintiff had put in her rebuttal, the plaintiff's husband was again placed upon the stand and was asked if he was in the operating room at the time of the first operation. The defendant objected, not only upon the ground that the husband was an incompetent witness, but also on the ground that the wife had already testified fully as to agency and the principal having done so the agent could not enlarge it, and also on the further ground that there was no question or pretense that anything was wrong in the first operation. The objections were overruled by the trial court on the theory that if the wife requested the

husband to be present in the operating room for the purpose of witnessing the operation and the husband acted for her in any capacity there, in any consultation that took place about what was going on or ought to go on, the two things together, in the court's view, constituted the husband the agent of the wife for that purpose. Thereupon the husband testified he was present at the first opertion at his wife's request and that he was there "for the purpose of seeing what was done."

Thereafter over the objections and exceptions of defendant, the husband was allowed to testify that during the course of the first operation he, the husband, stepped to the door to get fresh air and was called back by defendant who told him his wife's ovaries were in bad shape, one practically dead and the other badly diseased and ought to be removed, and asked the husband what about it. The latter told the doctor to use his own judgment as he, the husband, wouldn't know how they were. To this the doctor replied: "I say remove them, but you understand, if they are removed she can't bear any more children." The husband testified that thereupon the doctor took out all of one ovary and all but about probably one-fourth of the other one, giving as his reason for leaving a portion, that her passions would not be destroyed; that the doctor took out nothing else that he saw at all, except the ovaries and the appendix.

Over the objections and exceptions of defendant, the husband was then asked if he were present at the second operation and said he was, at his wife's request, and that the purpose was "to see just what was done at the operation."

Then, over the objections and exceptions of the defendant, the husband testified that, at the second operation, after his wife went under the anæsthetic, the defendant approached him and said: "If I cut in and find a cancer, there's no doing anything for her, but, if it's a tumor,—well, it's a little different." The husband asked him, "Doctor, you figure this a very serious operation?" To which the doctor repiled: "Very, very, but

the rapid condition this is growing she can't live long under that condition."

The husband testified that the doctor made a six or seven-inch incision, put his hand in and felt around, then turned about and said "This woman is undoubtedly pregnant, but it can't be possible, I removed both ovaries;" that the doctor put his hand back into the opening, felt around again, and pulled it out and left the room, pulling at one of his gloves like he was going to take it off. · He was gone about a minute and returning, said to the nurse "Loosen her limbs, I am going to examine her." He then made an examination through the vagina and said "That's all ails this woman, let's sew her up." He then walked out of the room again and, in a minute or a minute-and-a-half or two minutes, he returned saying: "There's a few adhesions; I'll loosen them." He then hooked his fingers, reached in and gave a couple of pulls and then sewed her up without using any scissors. After unsuccessful efforts to have the testimony stricken out, the husband was cross-examined and testified that at the first operation the doctor took out something he said was the ovary, the witness didn't know an ovary from any other part; that he, the husband, was not caring anything about whether she would have children but about the condition of her health, and he consented that the ovaries be taken out and left the decision of that matter to the physician; that witness thought the doctor left about one-fourth of one of the ovaries, left a part, something around a fourth, knew it was a piece of it, a small piece was all he knew about it; that at the second operation when the doctor inserted his hand, he said, "Undoubtedly this woman is pregnant, but it is impossible, I removed her ovaries," and was excited. The defendant denied he made the statement attributed to him, or that he left the room and acted as the husband says he did; and his version of what took place at the second operation was corroborated by Dr. Bergher and the nurse, both of whom were present.

Before passing on the question of whether plaintiff has sufficient evidence to entitle her to go to the jury, we deem it proper to first consider the question of the admissibility of the husband's testimony, since, if that was not admissible, the question of the demurrer to the evidence must be decided with the husband's testimony left out of consideration.

At common law, the husband was not a competent witness in his wife's lawsuit. [Joice v. Branson, 73 Mo. 28; Tockstein v. Bimmerle, 150 Mo. App. 491.] And he cannot be a competent witness for her except where the statute, section 5415, Revised Statutes 1919, has modified the common-law rule and, perhaps, in a few other limited instances which have been judicially determined to be exceptions to the rule upon one ground or another which will shortly be stated. The statute removes the disqualification of the husband to testify as a witness in his wife's suit "when such suit or proceeding is based upon, grows out of, or is connected with, any matter of business or business transaction, where the transaction or business was had with or was conducted by such married man as the agent of his wife." The qualification permitted by the statute is a limited one. The suit must be based upon, grow out of, or be connected with, the *particular business transaction* had *with* or *conducted by the husband* as the agent of the wife. [White v. Chaney, 20 Mo. App. 389, 394; First Nat'l Bank of Leavenworth v. Wright, 104 Mo. App. 242; Gardner v. St. Louis, etc., R. Co., 124 Mo. App. 461; Fishback v. Harrison, 137 Mo. App. 664; Senaca Co. v. Ellison, 208 S. W. 103; Taylor v. George, 176 Mo. App. 215; Baird v. First Nat'l Bank, 149 Mo. App. 367; Connecticut Fire Ins. Co. v. Chester, etc., R. Co., 171 Mo. App. 70.]

So far as the record shows the husband nowhere acted as the wife's agent except when he was sent by her in January to tell the doctor of her symptoms, and in what is here said we are not dealing with the evidence as to that interview. Later, plaintiff herself went to the defendant and had him examine her. The doctor told her

to go home and wait, which she did, at least she did go home. She returned later for further examination, and, so far as the record shows, she made these visits and arranged for the second operation herself.

It is true, the husband testified that during the first operation the doctor asked him about removing the ovaries, but there is no evidence that the husband was requested by the wife to be in there for any purpose of deciding how far the operation should go. The wife at the trial said she "didn't care anything about whether they (the ovaries) were removed out or not," and the only dissatisfaction at all on her part, over the first operation, seems to have been because the doctor had told her she couldn't have children as he had removed her ovaries, whereas, he had left a small piece of one ovary there and she afterwards had become pregnant. So clear was it that no complaint of negligence was made in regard to the first operation that the court in its instructions excluded from the consideration of the jury any issue of negligence connected with, or growing out of, the first operation either in the manner or the fact of its performance. So that the fact that the husband was consulted by the doctor with reference to the ovaries at the first operation could not constitute him her agent and make him competent to testify as to the second operation. At this second operation the husband was merely a silent spectator; so far as the record shows it was performed pursuant to arrangements made by plaintiff herself and without question or suggestion on the part of the husband. The contract of employment between plaintiff and defendant was, in legal effect, that he was to use his best judgment, carefully exercised, in determining what should be done for her and in treating her professionally. There was no business to be transacted between the doctor and the husband while the doctor was operating or after the plaintiff was put under the anæsthetic. Plaintiff did not testify that, if during the operation some question arose as to what the nature or extent of it should be, she wanted her husband to decide

it for her, nor did any question of the kind arise. She testified merely that at the first operation, she requested her husband to go with her, stay through the operation and see what was done; and at the second operation she asked him to go along and see what was done. If one spouse can, by saying to the other, "I want you to be present and witness what is done" and thereby make such spouse a competent witness on the ground of agency, then it would seem to be an easy matter to avoid the common-law rule and the express limitation of the statute.

But the plaintiff, being under an anæsthetic, was unconscious and this would be the same as if she were not there, and hence it may be urged that plaintiff thereby had the right to have an agent present to see and act for her. No doubt she would have the right to appoint her husband her agent to represent and act for her in any matter of business or business transaction where she was unconscious or absent or even present and conscious, but before the husband could testify as a witness, the transaction constituting the basis of the action must be one that is *"had with or conducted by"* the husband as her agent. And in this case it was nothing of the sort. In fact, the basis of the suit is not with regard to the *manner* of performance of the operation or the extent thereof. The action is for *negligently diagnosing* plaintiff's condition and in *deciding to perform* an operation. If the charge is true, the negligence was complete before the operation began, the operation itself being merely the result of that negligence, giving rise to the damage claimed, and there is no denial but that the operation itself was performed. The case is not, therefore, one where the husband's testimony is admissible under some exception to the common-law rule, or where it is admissible *ex necessitate rei*, on the grounds of public policy, as in the case of a criminal abortion performed on the wife, or a fraud or an assault perpetrated on her by her husband, or by others through the husband's agency. Such, for example, are the cases cited by plaintiff, to-wit, Turner v. Overall, 172 Mo. 271; Henry v.

Sneed, 99 Mo. 407; Moeckel v. Heim, 134 Mo. 576; and Cramer v. Hurt, 154 Mo. 112, 117, 120. In Orchard v. Collier, 171 Mo. 390, 399, the Supreme Court held that while it was proper to prove by the husband certain things he did, he having been shown to be the wife's agent, yet that it was error, to permit him to testify to things not done by him as the agent for his wife as the disqualification existing at common law ''was not removed by that or any other statute.'' It would seem that such holding is applicable to this case since clearly the basis of the suit is not in reference to the way in which the second operation was performed, nor was either the decision to operate or the operation itself a matter of business or business transaction *had with* or *conducted by* the husband as the agent of his wife. For the foregoing reasons, we entertain the view that the testimony of the husband was erroneously admitted, and the judgment should on this account be reversed, and the cause remanded for a new trial if there is sufficient evidence remaining in the case to justify its submission to a jury.

Should the defendant's demurrer to the evidence have been sustained?

The burden is on plaintiff to show not only that defendant made a mistake in diagnosing her condition and in deciding upon and advising the second operation, but she must also show that such was a *negligent* mistake and that the operation was so palpably unnecessary that a surgeon of ordinary care and prudence would not have advised nor undertaken it. [Vanhooser v. Berghoff, 90 Mo. 487; Fausette v. Grim, 193 Mo. App. 585; Nevinger v. Haun, 197 Mo. App. 416; Spain v. Burch, 169 Mo. App. 94.] And the question of whether defendant was negligent in making the diagnosis and in deciding upon the operation must be determined in the light of the conditions as they existed before the operation was performed. In other words, if conditions were such as to lead a surgeon of ordinary care and skill to think that plaintiff was not pregnant, or even that as a remote possibility she might be and yet an operation was necessary,

and defendant in the honest exercise of his best judgment thought an operation was proper, then defendant would not be liable even though it afterward turned out that defendant was mistaken in diagnosing plaintiff's condition. [Fausette v. Grim, supra; Lungford v. Jones, 18 Ore. 307, 322; 21 R. C. L. 388; Staloch v. Holm, 100 Minn. 276.] And it is also true, *if there were conditions existing* such as to raise a question whether an operation was advisible or proper, then the question of whether the defendant's decision to operate was negligent or not, should be gathered from the opinions and testimony of those who have special knowledge and are qualified to speak on such matters. [Moore v. St. Louis Transit Co., 226 Mo. 689, 705; Farrell v. Haze, 157 Mich. 374, 380-392; McGraw v. Kerr, 128 Pac. 870, 873; Adolyn v. Miller, 111 N. E. 313, 315; Getchell v. Hill, 21 Minn. 464, 465; Pettigrew v. Lewis, 46 Kans. 78, 81; Ball v. Skinner, 134 Iowa, 298, 308; Spaulding v. Bliss, 83 Mich. 311; Ewing v. Goode, 78 Fed. 442.]

But, in the case at bar, there is a dispute over the following matters: Whether there were any such existing, untoward and abnormal conditions; whether the defendant made *as full and as exhaustive an examination* as he should have done before deciding upon what should be done; whether he did not *carelessly assume* that plaintiff was not pregnant merely because he had removed her ovaries when he knew he had left a small portion of one of them and knew or should have known, as a medical man, that it was not impossible for her to become pregnant.

According to plaintiff's testimony, the doctor, upon placing his hand upon her abdomen, at once announced that she was pregnant, but when he learned he had removed her ovaries he, with no examination other than pressing upon her abdomen, said she had a tumor and advised an operation. She further says that he could move her womb freely although not so far as ordinarily on account of its size; that all he did was to press his

hands upon her abdomen; that her symptoms were the same as in the case of her other pregnancies, and that she told him so; that she had no pains, except that she had a pain in the pit of her stomach when she had the flu in January; that her nerves didn't bother her; that she told him repeatedly she thought she was pregnant, and says she would not have worried about the growth in her womb had not the doctor told her it could not be pregnancy; that she had nothing in the way of adhesions tying her womb down, but had perfect freedom of movement and the evidence was that a few days before going to the hospital she assisted in papering her house including the ceiling and experienced no difficulty in getting her arms up to do so; that the doctor told her it was a tumor and not pregnancy; that he said nothing about adhesions or about making a merely exploratory operation to learn what was the matter.

Dr. Clark, her family physician, gave testimony tending to show that when he examined her before the first operation he found her ovaries free in the abdomen, not enlarged and not tender; that the child born July 19, was a fully developed, nine months' child, consequently she was 7 months along when the defendant finally examined and operated on her. The substance of his testimony is that while adhesions could cause an abortion or premature birth, it would all depend on the extent thereof, and that adhesions to such an extent as to cause that, would prevent the foetus from growing, and a woman "certainly wouldn't" be able to carry a child to a period of seven months; that although adhesions arise from infected conditions and follow an operation, the tendency is for nature to eliminate them and frequently they disappear in a short time. In other words, there is sufficient evidence in the record to make ie an issue of fact as to whether plaintiff's pregnancy was anything other than a *normal* pregnancy *unaccompanied* by adhesions which bound the womb down to such an extent as to prevent pregnancy from being discovered had a careful investigation been made, or to cause plaintiff to be in such

a condition as to reasonably give rise to the thought that the second operation should be had. The mere fact that plaintiff became pregnant notwithstanding she had only a small portion of one ovary left, does not, of itself, show that her pregnancy was abornmal, i. e., that *abnormal conditions existed* with that pregnancy, for the expert evidence is that a woman with only a small piece of ovary may become pregnant, and if a small piece of the ovary is left it will function and if it does, and the same is impregnated with the male germ, pregnancy will result. Knowledge of this fact would not justify a physician in, at once and without careful examination, jumping to the premature conclusión that plaintiff had a tumor.

There was evidence, even from the expert witnesses offered by defendant, that *if* at the time plaintiff was operated on the second time she had perfect freedom of movement in every way and her symptoms and condition were no different from those of her other pregnancies, and she told the doctor she had been pregnant and had borne children twice before and thought she was pregnant again and the doctor, only two months before the birth of a fully developed full-period child, merely pressed his hand across her abdomen and decided she had a tumor, then such was *not* a sufficient and careful examination. There was also evidence that "ballottement" was one of the tests proper to be used, and that the beating of the foetal heart could be determined by the use of the stethoscope. The defendant says he did not use the stethoscope, and, if plaintiff's evidence is true, he did not use the ballottement. There was also expert evidence to the effect that it at seven months the uterus and its contents could be manipulated freely from side to side and there was no pain, no catching or holding on the inside and no hindrance to the freedom of movement, the diagnosis would be that there were no adhesions—at least, no adhesions dense enough to interfere with pregnancy or childbirth and a woman could go through the latter all right.

So that the question of whether there was evidence of negligence on the part of defendant comes down at last to whether the facts and conditions were as claimed by plaintiff, or whether they were as asserted to be by defendant. If they were as plaintiff says they were, then there was evidence from which the jury could find that proper care and precaution was not taken. After a careful study of the record, we have come to the conclusion that, aside from the husband's testimony, plaintiff had sufficient evidence to go to the jury, though this conclusion has been reached not without considerable difficulty, at least in the mind and on the part of the author hereof. There are some things which may appear to cast doubt upon the *extent* to which plaintiff goes in asserting her facts but these are matters for the jury to pass upon in deciding the question of her credibility; they do not destroy her testimony altogether.

Neither are we able to say that there is no evidence whatever tending to show that plaintiff has suffered no ill effects from the second operation. Of course she did suffer pain and worry as a result of it. Whether her present weak and nervous condition is a result thereof or not we cannot say. Dr. Clark, however, undoubtedly says that it, in connection with the worry produced thereby, could produce such a condition. We note that the record discloses that the plaintiff had the "flu" in January preceding the second operation. Just how much of her present condition may be traceable to that we do not know, nor is any mention of that fact made by either side. No doubt the second operation, *if unnecessary*, did not add to her recuperative powers. We cannot say, however, that plaintiff has suffered no ill effects from the second operation, and the contention that her present weak and nervous condition is not the result of the operation would, if established, go only to the extent of her recovery; it would not necessarily entitle defendant to have his demurrer to the evidence sustained.

A number of criticisms are made of the instructions which need not be noticed. Those submitting the question

whether defendant was negligent in diagnosing plaintiff's condition "and advising *and performing* the surgical operation" of May 20, could perhaps have been more accurately drawn if they had been so worded as to clearly set forth that the negligence as to the last named matter was in *deciding to perform* the operation, or in undertaking it at all, rather than in the performing of it—i. e., the *manner* of its performance. However, there was no claim, and no evidence, of any negligence in the manner of its performance and hence it is not reasonable to suppose that the jury could have been misled by the expression used. But it would doubtless be better to avoid any possible ambiguity in this regard.

The judgment is reversed and the cause remanded for a new trial. All concur.