CORA FAUSETTE, by her Guardian and Curator, WILLIS A. JOHNSON, Respondent, v. EZRA GRIM and EDWARD GRIM, Appellants.

Kansas City Court of Appeals, May 1, 1916.

1. **PHYSICIANS AND SURGEONS: Malpractice: Negligence in Advising Operation: Mistaken Diagnosis.** In an action for malpractice where the charge is, not that the operation was unskilfully done but that it was negligently advised, plaintiff must not only prove that the operation was unnecessary but also that it was so palpably unnecessary that a surgeon of ordinary care and skill would not have advised it. If conditions were such as to lead surgeons of ordinary care and skill to think an operation was necessary and the surgeon, in the honest exercise of their best judgment, thought an operation was proper, then he would not be liable even if it turned out afterwards that he was mistaken in his judgment.

2. ———: ———: ———: ———: **Burden of Proof.** The burden is on plaintiff to establish the negligence charged. Hence, in an action based upon the negligent advising of an operation, it devolves upon plaintiff to show that the operation in question was one which surgeons of ordinary care and skill in the honest exercise of their best judgment would not have advised.

3. ———: ———: ———: ———: Evidence examined and *held* that when plaintiff not only fails to show that her condition was not such as to render an operation apparently advisable, but by her admissions and failure to deny statements said to have been made by her as to her condition, has to that extent shown that conditions were such as to lead a reasonably careful and learned surgeon to believe an operation was necessary, plaintiff has failed in her proof. The fact that the jury is not required to believe defendant's testimony makes no difference, since plaintiff cannot rely upon the jury's right to disbelieve the defendant's testimony as to conditions to take the place of affirmative proof that the advising of the operation was negligent.

4. ———: ———: ———: **Discharging Patient from Hospital too Soon.** It being shown that post operative insanity is a mild form of insanity which is temporary in its nature if the patient is properly cared for and treated by being kept quiet and free

from all excitement and disturbance, but that if the patient is subjected to excitement she is likely to become violently insane; that as soon as symptoms of post operative insanity began to manifest themselves, recognized good practice required that the patient be kept quiet and secluded in her room at the hospital attended by a nurse and free from exciting and disturbing influences, but that instead of doing this, defendants, in order to get rid of plaintiff, negligently ordered her removed before she was in a proper condition to go and without explaining to the patient's relatives her condition and the necessity for keeping her quiet; and that as a result of such premature removal plaintiff became violently insane and her sickness was greatly aggravated, a case was made for the jury upon the charge that defendants negligently discharged the patient from the hospital.

Appeal from Adair Circuit Court.—*Hon. C. D. Stewart*, Judge.

REVERSED AND REMANDED.

*Cooley & Morrell* and *Higbee & Mills* for appellants.

*Weatherby & Frank* and *Campbell & Ellison* for respondent.

TRIMBLE, J.—This is an action for malpractice. Defendants are physicians and surgeons conducting a hospital at Kirksville.

On December 13, 1913, plaintiff, a married woman twenty-five years of age, then living at Hannibal, was taken suddenly ill with a severe pain in the region of her right ovary (which is also the region of the appendix, the two being close together, the ovary being, perhaps, a little higher than the appendix). Prior to that, at times of menstruation, she had suffered with pain in her right ovary, but the attack of December 13 was much more severe than anything she had had before, and besides, she had missed one or two menstruation periods and was about two months advanced in pregnancy. She called Dr.

Shanks of Hannibal who pronounced her trouble appendicitis and advised an operation as soon as she recovered from the attack. He used palliative remedies and treated her until the 15th of December, when she had so far recovered as to have no fever and was able to walk.

On the 18th of December, plaintiff, accompanied by her mother and sister, went to defendants' hospital and consulted them in regard to her condition. She told defendants of her illness of the 13th that she was sick only a few days, that Dr. Shanks said it was appendicitis, but that she preferred to come to defendants' hospital. After listening to a history of her trouble and making a physical examination, which included an investigation through the vaginal canal, defendants told her that her appendix and right ovary were diseased, and advised an operation for the removal of both. According to plaintiff's petition and the evidence of plaintiff and the evidence introduced in her behalf, when defendants advised the operation she informed them that she was pregnant and asked what effect an operation would have upon her pregnancy, telling them she would not submit to an operation if it would endanger her chances of becoming a mother. She and her witnesses, her mother and sister, say that defendants assured her an operation would have no effect whatever upon her pregnancy, that she would be up and out of the hospital in two weeks and could go on and bear her child at the proper time.

The operation was performed next morning and five days later, December 24, plaintiff suffered an abortion caused, as she claims, by the operation. Six days after the abortion she became afflicted with postoperative insanity. At defendants suggestion and direction she was taken away from the hospital on January 3, 1913. She had been manifesting symptoms of post-operative insanity from December 30, and

while being taken from Kirksville to Hannibal became violently insane. On January 6, 1913, she was adjudged insane and committed to the State Hospital at St. Joseph where she remained until October 7, 1913, when she was discharged, having recovered her sanity. Prior to her discharge and while she was insane, her guardian brought this suit for $7500 damages. A verdict and judgment for $1000 was obtained, and defendants have appealed.

The case was submitted to the jury upon two charges of negligence. The first of which was that, with knowledge of plaintiff's pregnancy, defendants carelessly diagnosed her trouble as *acute* appendicitis when by ordinary care they should have known that she did not have that disease, and carelessly advised an operation which was not necessary to preserve her life and health and which resulted in an abortion, and that the two brought on post-operative insanity, all of which impaired her mind and health and endangered her life.

On this branch of the case plaintiff's theory is that an operation, for appendicitis and the removal of an ovary, upon a pregnant woman, is recognized by the medical and surgical fraternity as so likely to produce an abortion that ordinarily good and careful practice requires that no operation be had unless the patient's condition on account of the appendicitis is so dangerous as to imperatively require it; that even though she has had an attack of appendicitis, yet, if she has so far recovered as to have no fever, this shows she no longer has *acute* appendicitis and when it has ceased to be *acute,* the patient is no longer in danger from that attack at least. And since seventy-five per cent of all cases of appendicitis run their course to recovery without an operation, and the only purpose of an operation upon a person who has recovered from an attack of appendicitis is to prevent a recurrent attack, it is not good practice to operate,

for appendicitis and a diseased ovary, upon a pregnant woman when her pulse and temperature show the attack is no longer acute, because the danger of producing an abortion is so much greater than the danger of a recurrent attack.

Plaintiff, in support of her theory, introduced two witnesses, one a physician of Adair county and the other a surgeon in charge of another hospital in Kirksville. The latter testified that it was bad practice to operate for appendicitis upon a person whose temperature was normal as the normal temperature showed the ·disease was no longer at an acute stage; that an operation for appendicitis and the removal of an ovary of a woman from one to three months in pregnancy might result in an abortion; that the chances for such a result were about even; that the chances of an operation resulting in post-operative insanity are about one in from 200 to 400 cases; and that the plaintiff's post-operative insanity was the result of the operation and abortion combined. Plaintiff's other witness testified that it was bad practice to operate upon a person for acute appendicitis whose temperature was normal and in which *no other conditions were present.* He further testified that the "safest treatment" for a woman one or two months pregnant, who has so far recovered from an attack of appendicitis as to have a normal temperature, is to treat her with a mild laxative and get her out of the pregnant state without an operation as a surgical operation is so likely to produce an abortion. It will be noted that, thus far, plaintiff's experts predicated their evidence that it was bad practice to operate when the temperature was normal, only with reference to one who had just recovered from an acute attack of appendicitis and who has no other complications or troubles except pregnancy. On cross-examination, however, the last mentioned expert testified that surgeons do not frequently operate for an

ovarian cyst unless it is necessary to save the patient's life. He stated, however, that there is always an element of danger in an ovarian cyst, but that unless the growth is rapid and it becomes impaired during pregnancy it is best not to remove it. He also stated that it was a question in his mind whether there was any other stage of appendicitis than the acute; that if concretions and pus are found in the appendix it is conclusive proof that appendicitis exists.

There was no evidence that defendants were incompetent or unskilful surgeons nor was there any claim that the operation itself was not performed in a skilful and proper manner. The charge is that defendants negligently advised an operation. In this kind of a case plaintiff must not only prove that the operation was unnecessary but also that the operation was one so palpably unnecessary that a surgeon of ordinary care and skill would not have advised it. If conditions were such as to lead surgeons of ordinary care and skill to think an operation was necessary and defendants, in the honest exercise of their best judgment, thought an operation was proper, then defendants would not be liable even if it turned out afterwards that they were mistaken in their diagnosis. [Vanhooser v. Berghoff, 90 Mo. 487, l. c. 496; Gore v. Brockman, 138 Mo. App. 231; Granger v. Still, 187 Mo. 216; Martin v. Courtney, 75 Minn. 255; Staloch v. Holm, 100 Minn. 276.] The burden is on plaintiff to establish the negligence charged. Hence it devolved upon her to show that the operation which she says defendants negligently advised was one which surgeons of ordinary care and skill in the honest exercise of their best judgment would not have advised.

Defendants testified that upon their examination of plaintiff on the day she came to them, they found a soreness and tenderness on the right side over

the appendix; that the right ovary was enlarged, the pelvis was tender and the uterus retroverted; that plaintiff not only told them of the attack she had on the 13th which Dr. Shanks had pronounced appendicitis but that she had had other attacks before and that she had had three miscarriages; that they told her she might and might not be pregnant but they thought probably she was; that they told her the chances of an abortion following the operation would be about even; that she said she wanted the operation performed anyway as she could not stand the pain of another attack like the last one. Defendants say they told plaintiff she had a diseased ovary and appendix and advised their removal; that in their judgment it was the proper thing to do. They say further that when the abdomen was opened they found the appendix adhered and inflamed, containing concretions and pus which is a conclusive test of appendicitis; that the uterus was over on one side, adhered to the pelvis and retroverted; that the ovary was diseased and enlarged to the size of a goose egg, four or five times its normal size; that they removed the appendix and right ovary, loosened the adhesions of the womb and placed it in its normal position; that the condition of the womb indicated former miscarriages and that with her womb in the condition it was in she could not have borne the child but would miscarry; that as the appendix contained concretions and pus it was likely to give trouble at any time and would probably do so before childbirth; that the fact that she was pregnant was a good reason for operating because the appendix was right beside the uterus and the expansion thereof as pregnancy advanced would loosen the adhesions of the appendix and let the pus out into the abdomen resulting in peritonitis and probable death to the patient.

The testimony of defendants as to the diseased ovary and the condition of the womb is corroborated by plaintiff who said she had suffered pain in that ovary at her periods. And she never at any time testified whether she had or had not had miscarriages before, and *never denied that she told defendants she had had three miscarriages.*

A number of eminent surgical and medical experts from St. Louis, St. Joseph and elsewhere, testified for defendants that a woman who had had several miscarriages is very likely to have another; that where the womb is adhered and retroverted the probability of an abortion is very great; that the best time to operate upon a pregnant woman is in the early stages of pregnancy. They also testified that, even in the case of a woman in the early stages of pregnancy who had recovered from an attack of appendicitis and had a normal temperature, an operation would be advisable; that a recurrent attack would be very severe and dangerous in the later stages of pregnancy and an operation then would be exceedingly dangerous; that if, upon opening the abdomen, the ovary was found to be diseased and enlarged, the womb retroverted and adhered and the appendix having concretions and pus in it, they would remove both the appendix and diseased ovary and correct the womb conditions; and that the fact that the woman was in an early stage of pregnancy was a good reason for operating rather than for not doing so; that a person can have a normal temperature and yet the appendix be in a condition termed appendicitis; that if there are concretions and pus in the appendix the person has appendicitis; that some of the most dangerous cases of appendicitis are without fever after a certain period; and that appendicitis with pregnancy is exceedingly dangerous.

All of the doctors who had seen the appendix and ovary which had been removed from plaintiff

united in saying that both were diseased; and all of them, some half a dozen or more, pronounced an operation upon a pregnant woman for their removal to be advisable and proper practice.

Plaintiff introduced no testimony tending to show that conditions were not as defendants said they were. Consequently, she is in this position: She is claiming in her suit that defendants negligently advised an operation, that is, did not exercise the proper judgment in that matter when her proof fails to show that her condition was not such as to lead an ordinarily careful and skilful surgeon to advise an operation in the exercise of his best judgment. This does not mean that the testimony of defendants as to conditions must be accepted as true, but merely that before plaintiff can establish negligent liability against defendants for advising an operation, she should show that she was not in a condition which would lead a careful surgeon to think, in the exercise of his best judgment, that an operation was necessary. And as said before, her statement as to previous suffering with her ovary and her failure to say whether she had had prior miscarriages coupled with her failure to deny that she told defendants she had had them, tends to corroborate the claim that conditions were such as defendants say they found.

If now, plaintiff in order to prove that the defendants were negligent in advising the operation, must show not only that it was unnecessary but that her condition was such that an ordinarily skilful surgeon would have known it was not necessary, how has she maintained her burden of proof when she not only fails to show that her condition was not such as to render an operation apparently necessary but by her admissions and failure to deny as above mentioned, has to that extent shown that conditions

were such as to lead a reasonably careful and learned surgeon to believe that it was necessary? The fact that the jury is not required to believe defendants' testimony as to conditions makes no difference. As said in Spain v. Burch, 169 Mo. App. 108, plaintiff cannot rely upon the jury's right to disbelieve defendants' testimony as to conditions to take the place of her affirmative proof that the advising of the operation was negligent.

For this reason, we do not think plaintiff was entitled to go to the jury upon the question whether defendants were negligent in advising an operation, and, the instruction submitting that phase of plaintiff's case should not have been given.

The other charge is that defendants negligently directed plaintiff to be removed from the hospital whereby she was rendered violently insane.

The evidence shows that post-operative insanity is a mild form of insanity which is temporary in its nature if the patient is properly cared for and treated by being kept quiet and free from all excitement and disturbance, but that if the patient is subjected to things likely to excite, disturb or render her more nervous, then the patient is likely to become violently insane; that as soon as plaintiff began to manifest symptoms of post-operative insanity, recognized good practice required that she be kept quiet and secluded in her room at the hospital attended by a nurse and free from all exciting and disturbing influences, but that instead of following this practice, the defendants, in order to get rid of the plaintiff and to obtain her room for another patient, carelessly and negligently directed plaintiff to be removed from the hospital when they knew, or by ordinary care should have known, that good practice required that she remain in the hospital, under proper care and nursing until she had acquired sufficient strength of mind and body to be safely removed; that as a result of such

premature removal plaintiff became violently insane and her sickness and impairment of mind was greatly aggravated.

We think that there was sufficient evidence to take this feature of the case to the jury.

The evidence clearly shows that on December 30, 1912, plaintiff began to manifest symptoms of post-operative insanity and that defendants immediately telephoned to plaintiff's stepfather to come and get her as she was well and ready to go; that they did not inform her relatives that she had post-operative insanity or advise them of the necessity for keeping her quiet in order to prevent it developing into the violent type; there is also evidence that they hastened the departure of plaintiff from the hospital insisting upon her being taken the evening of the day her friends arrived at Kirksville to get her; that her pulse and temperature at the time she left, as shown by the defendants' own charts, showed that she was not in a condition to be taken away; that the excitement of the trip on the train caused her to become violently insane and to remain so for a long period of time.

While there is evidence on defendants' part tending to justify such removal yet we are of the opinion that plaintiff introduced substantial evidence tending to show a negligent disregard of duty in sending the patient away under the circumstances.

Many other objections are raised against the instructions, and to the introduction of evidence. If there are errors in the instructions they may be avoided at the next trial. It may be well to call attention to the fact that it is improper to ask an expert whether a given result was caused by something else, since that is an invasion of the province of the jury.

The judgment is reversed and the cause remanded. All concur.

## ON MOTION FOR REHEARING.

TRIMBLE, J.—In reaching the conclusion arrived at in the foregoing opinion that plaintiff was not entitled, under the evidence adduced to go to the jury upon her charge that defendants negligently advised an operation, we have not overlooked the fact that plaintiff testified that defendants assured her the operation would not affect her pregnancy. Perhaps such false assurance that the operation would have no effect upon pregnancy might be a circumstance to be taken into consideration along with other facts in determining whether or not the operation was negligently advised and, therefore, the fact of such false assurance would not be inadmissible under a charge of negligent advice in regard to an operation. But such false representation or assurance, *alone and of itself,* would not be sufficient to establish the charge that the operation was unnecessary, and so palpably unnecessary, that a reasonably skilful and prudent surgeon would not have advised it. An operation might be imperatively necessary and yet, for various reasons, a patient might not be told the truth as to an incidental or auxiliary effect thereof. No doubt a patient's consent to an operation is an essential prerequisite to the surgeon's *right to perform* an operation, if the patient is in possession of his faculties or is in such condition that consent can be obtained. [Pratt v. Davis, 224 Ill. 300; Mohr v. Williams, 95 Minn. 261.] And if a surgeon should obtain the patient's consent by a false and fraudulent representation, the surgeon might be liable upon that cause of action. [Pratt v. Davis, supra.] In such case he would perhaps be liable to an action for deceit. [2 Am. & Eng. Ency. of Law (2 Ed.), 803; 30 Cyc. 1579.] But that is not the charge in this case. And it may be well to observe that, if it had been, no issue

of whether the defendant assured plaintiff the operation would not result in an abortion was anywhere submitted to the jury.

Nor have we overlooked defendant's contention that where the treatment is in accord with a recognized system of surgery it is not for the court or jury to determine whether that system is best nor to decide questions of surgical science on which surgeons differ among themselves. That principle is well recognized. But the facts in this case are such that this principle cannot be applied so as to justify us in taking the case from the jury. The facts involved in the negligent, sending of the patient from the hospital, and, had a proper showing been made, perhaps those involved in advising the operation, make, or would have made, the question of liability one of mixed law and fact, and, therefore, one for the jury. [30 Cyc. 1588.] The questions involved were not those of *purely* medical and surgical science.

It follows that both appellant's motion to modify and respondent's motion for rehearing should be overruled. It is so ordered. All concur.