## LOUISE SCHMIDT, by Robert Schmidt, Guardian ad Litem, Respondent, v. E. C. STONE, Appellant.

(194 N. W. 917.)

**Physicians and surgeons — weight of conflicting expert testimony and inferences therefrom in malpractice for jury.**

    1. In a malpractice action the weight of expert testimony, when there is conflict therein, and the inferences to be drawn therefrom, are for the jury.

Note.—(1, 2) Weight of testimony of experts question for the jury, see note in 42 L.R.A. 764; 11 R. C. L. 586; 2 R. C. L. Supp. 1276; 4 R. C. L. Supp. 712; 5 R. C. L. Supp. 610.

    (3) Conclusiveness of witness's answers on cross-examination as to collateral matters, see 28 R. C. L. 613; 3 R. C. L. Supp. 1585; 4 R. C. L. Supp. 1831; 5 R. C. L. Supp. 1458.

**Evidence — rule that uncontradicted expert testimony conclusive held inapplicable where all experts admit doubt on the matter.**

2. The rule that expert testimony, upon technical matters, beyond the training or experience of lay witnesses, must, when uncontradicted, be accepted as conclusive by the jury, *held* for the reasons stated in the opinion, to have no application to the facts in this case.

**Witnesses — answers on cross-examination on irrelevant or immaterial matters conclusive against examiner.**

3. Answers of a witness, on cross-examination, to questions upon irrelevant or immaterial matters, are conclusive against the examiner, and it is error to receive, over objection, evidence for the sole purpose of contradicting such answers.

**Trial — error to submit competency of impeaching testimony to jury.**

4. Preliminary questions relating to the sufficiency of the foundation laid for impeaching questions, are for the court, and, in the absence of conflict in the testimony of witnesses, brought out during their examination, as to the essential facts which constitute such foundation, it is error to submit the question of the competency of the impeaching testimony to the jury.

**Physicians and surgeons — exercise of reasonable degree of care and skill by physician presumed.**

5. In the absence of evidence to the contrary, the law presumes the exercise of a reasonable degree of care and skill by a physician and surgeon.

**Physicians and surgeons — mere fact that operation unsuccessful or that defects appear thereafter not evidence of negligence, unless assumed from unexplained presence.**

6. The mere fact that an operation is not successful or that defects appear after it is performed, unless of such a nature that negligence must be assumed from their unexplained presence, is not evidence of negligence: the physician is not an insurer, and the doctrine of res ipsa loquitur has no application.

**Appeal and error — excessiveness of unchallenged verdict cannot be raised for first time on appeal.**

7. When a motion for a new trial on the ground of excessiveness is not made and the amount of the verdict is in no manner challenged in the trial

---

(5) Degree of care and skill which a physician must exercise, see note in 37 L.R.A. 830; 21 R. C. L. 406; 3 R. C. L. Supp. 1155; 4 R. C. L. Supp. 1414; 5 R. C. L. Supp. 1159.

(6) Liability of physician or surgeon in absence of personal negligence, see 21 R. C. L. 392; 3 R. C. L. Supp. 1153; 4 R. C. L. Supp. 1414; 5 R. C. L. Supp. 1158.

(7) Right to raise question of excessiveness of damages first time on appeal, see 2 R. C. L. 83; 4 R. C. L. Supp. 79.

court, the defendant cannot, for the first time, on appeal raise the question that the verdict is too large.

Opinion filed July 25, 1923. Rehearing denied September 10, 1923.

Appeal and Error, 3 C. J. § 910 p. 989 n. 45. Evidence, 22 C. J. § 823 p. 731 n. 79. Physicians and Surgeons, 30 Cyc. p. 1584 n. 48, 49; p. 1588 n. 86. Trial, 38 Cyc. p. 1514 n. 40. Witnesses, 40 Cyc. p. 2771 n. 36.

An appeal from the District Court of McHenry County, Second Judical District, *Buttz, J.*

Reversed.

*McGee & Goss,* for appellant.

When a plaintiff produces evidence that is consistent with an hypothesis that the defendant is not negligent, and also with one that he is, his proof tends to establish neither. Louisville & N. R. Co. v. East Tennessee V. & G. R. Co. 9 C. C. A. 314, 22 U. S. App. 102, 114, 60 Fed. 993; Ellis v. Railway Co. L. R. 9, C. P. 551.

"A most important field of expert testimony is one in which the opinion of nonexperts is wholly inadmissible except to the limited extent stated in the preceding paragraph (as to matters a nonexpert may observe and describe as a fact) as that relating to the diagnosis causing affects of disease and kindred matters of medical practice." 11 R. C. L. 609, § 33; Wurdeman v. Barnes (Wis.) 66 N. W. 111; Stalock v. Holm (Minn.) 111 N. W. 1264; Sherwood v. Babcock (Mich.) 175 N. W. 470; O'Brien v. Brotherhood of American Yeomen (Mich.) 150 N. W. 130.

"The rule is firmly established that a witness cannot be impeached by showing the falsity of his testimony concerning facts collateral to the issue."

"The principal reasons of the rule are undoubtedly that but for its enforcement the issues in a case would be multiplied indefinitely and the real merits of the controversy would be lost sight of in the mass of testimony to immaterial points." 28 R. C. L. 613, § 202.

"It is not permissible to impeach a witness by showing that he has made prior contradictory statements as to collateral, irrelevant or immaterial matters. And the test is whether, if the matter alleged to

have been stated by the witness out of court were true, the party seeking to impeach the witness would be entitled to prove such matter in support of his case." 40 Cyc. 2699, § 3b.

When a witness is inquired of on cross-examination as to his occupation for the purpose of showing that he was engaged in an unlawful or degrading business, the party making the inquiry does so at his peril and cannot show by other witnesses that the answers of the witness on this collateral matter were untrue. State v. Malmberg, 14 N. D. 523; State v. Haynes, 7 N. D. 70; Becker v. Cain, 8 N. D. 617.

A witness is not to be discredited because of a discrepancy as to an immaterial matter. Mann v. State, 4 L.R.A.(N.S.) 934; Kirk v. Scott (Wash.) 31 L.R.A.(N.S.) 981; Furrough v. Northern Oil Mill (Ark.) 45 L.R.A. (N.S.) 462; Williams v. Spencer (Mass.) 5 L.R.A. 790; U. S. v. Lancaster, 44 Fed. 896; Carpenter v. Lightfelter (Neb.) 32 L.R.A. 422; Morgon v. Knous, 115 U. S. 69, 78, 29 L. ed. 316.

There is an exception to the rule, however, which is as well established as the general rule itself; and that is that "where the evidence thus admitted is so impressive that in the opinion of the appellate court its effect is not removed from the minds of the jury of its subsequent withdrawal or by an instruction of the court to disregard it the judgment will be reversed on account of its admission and a new trial granted." See 38 Cyc. 1441–1443; State v. McGahey, 3 N. D. 293; Bishop v. Ry. Co. 4 N. D. 536; Armour v. Kallmeyer, 16 L.R.A. (N.S.) 1110; Hopt v. Utah, 120 U. S. 430; Throckmorton v. Holt, 180 U. S. 552–557 and cases cited.

"It is the province and the duty of the court to pass upon the competency of evidence. This charge requested by the defendant violated this rule of law in referring the question of the competency of the evidence to the jury and was for that reason, if no other, properly refused." Tarver v. State, 137 Ala. 29, 34 So. 628.

It is plain that the statute never contemplated that the defendant, called for cross-examination under the statute, could be used as an opposition expert and be compelled to answer hypothetical questions.

To permit such was a gross and prejudical error.

But this statute (permitting cross-examination of adverse party) was never meant to change the order of the trial or the rules of cross-examination so as to permit a party to inject a part of his own case into

the cross-examination of his opponent's witnesses. Schmidt v. Schmidt (Minn.) 50 N. W. 598; Suter v. Page (Minn.) 67 N. W. 68.

The rule in this state is that we view plaintiff's testimony with every reasonable inference and intendment indulged, and upon such view, if there is any substantial evidence to support the verdict, it will be upheld. Barkely v. Quick, 33 N. D. 124; Swanstrom v. Minneapolis, St. Paul & S. Ste. M. R. Co. 34 N. D. 141; Montana E. R. Co. v. Lebeck, 32 N. D. 162; Northern Trust Co. v. Bluegger, 35 N. D. 150; Skogness v. Seger, 35 N. D. 366; Clerk v. Ellingson, 35 N. D. 546; Senk v. Stephen, 37 N. D. 491; Rittle v. Woodward, 31 N. D. 113; Akin v. Johnson, 28 N. D. 205; State v. Cray, 31 N. D. 67; Rickel v. Sherman, 34 N. D. 298; Blackorby v. Ginther, 34 N. D. 248; Oakland v. Nelson, 28 N. D. 456.

"The judgments of experts or the inferences of skilled witnesses, even when unanimous and uncontroverted, are not necessarily conclusive on the jury." 22 C. J. 728, 735, ¶¶ 823, 825, 828.

*Campbell & Funke, E. R. Sinkler, M. O. Eide,* for respondent.

"Certain evidence may be excluded on the ground that it has so slight or remote a bearing on the case, either in point of time or in value the court may exercise a discretion in excluding it on these grounds." 1 Jones, Bluebook on Ev. p. 665, ¶ 135.

"Evidence made relevant by that of the adverse party:" 1 Jones, on Ev. ¶ 171.

Every presumption is against prejudice and in favor of the proper conduct of the court and jury. The contrary must affirmatively appear in the record. Yet, counsel for defendant, would have us here as elsewhere, infer and surmise error and prejudice; infer one's conduct on the part of the jury, in disregard of oath and instructions, presumed to have been given upon adjournment. 4 C. J. xvi. pp. 731, 736, 756, 771, 828, 924, 953, 957, §§ 2666(b), 2698, 2714, 2717, 2809, 2897, 2933, 2938; Ness v. Jones, 10 N. D. 587; Morris v. Minneapolis, St. P. & S. Ste. M. R. Co. 32 N. D. 24; Lander Mach. Co. v. Konantz Saddlery Co. 17 N. D. 310; F. A. Oatrick & Co. v. Northberg, 21 N. D. 377; Freerks v. Nurnberg, 33 N. D. 587.

That excessiveness or inadequacy of damages is a question of fact for the jury "which shall not be reviewed in the supreme court under

Comp. Laws, 1913, § 7842" certainly cannot be questioned. It is a question of fact. Larson v. Russell (N. D.) 176 N. W. 998; 4 C. J. 646, note 74.

It is not enough merely for the damages to be excessive, but they must be so excessive as to indicate that this verdict of a jury was given under the influence of passion or prejudice. Comp. Laws, 1913, § 7660, Subd. 5; Daniels v. Payne, 191 N. W. 776, 182 N. W. 1010.

JOHNSON, J. This is a malpractice action. The case was tried to a jury and resulted in a verdict of $10,333 in favor of the plaintiff. After both sides rested, the defendant moved that the action be dismissed and also for a directed verdict for nominal damages of $1. Both motions were denied. Judgment was entered on the verdict and appeal therefrom was perfected to this court. A motion for a new trial was not made.

Appellant specifies sixty-three errors. These are grouped in the brief of appellant's counsel under eight general assignments. They relate, in general, to the reception of nonexpert testimony upon technical questions of medical practice and diagnosis; collateral impeachment, erroneous instructions, testimony as to the other cases of malpractice, abuse of cross-examination under the statute, misconduct of counsel and excessiveness of verdict. It is also, of course, asserted that the court erred in denying motion for dismissal and refusing to grant the motion for the direction of a nominal verdict.

The facts, as testified to by plaintiff's witnesses are as follows: The plaintiff, Louise Schmidt, was fifteen years old at the time of the trial, in January, 1922. Sometime during the summer of 1915, her mother says she took plaintiff, then a girl of eight years, to the office of the defendant at Balfour to have her adenoids removed. The girl herself says she went there to have her tonsils removed. The mother does not testify to any conversation with defendant prior to or at the time of the operation with reference to the removal of the tonsils or the uvula. The operation was performed, her throat was sore for sometime afterwards and her mother discovered, a few days after the operation, that her uvula was gone, although she says she saw it in her mouth just prior to the trip to Balfour. The mother and the plaintiff testified that, following the operation, plaintiff choked when she tried to swal-

low food, especially on solids; that the food and water tended to go the wrong way; that her voice was affected and that she did not sing after the operation, although she did before .quite well; that she suffered from frequent and severe headaches, colds and earaches since the operation, but not before; that she had difficulty in swallowing and in talking; and that her enunciation was affected. Plaintiff herself testified with reference to some of these complaints that they were caused by the loss of the uvula. It was sought to establish by the testimony of Dr. Johns that there was a causal connection between the loss of the uvula and the complaints and physical condition testified to by plaintiff and her mother. In view of the fact that he is the only expert testifying for the plaintiff, his testimony is of course very important. While it is not very definite or specific, we think that it is sufficient to support a verdict, in so far as it tends to show a causal connection between at least some of plaintiff's ailments and the loss of the uvula. He specifically says he cannot say that the uvula is necessary in the act of swallowing; or that headaches would result from its removal. He further says that earache would not directly result from the removal of the uvula, but that there is a bare possibility that it might indirectly result therefrom. He does say that the removal of the uvula might slightly affect the voice and indirectly cause earache, that it tends to prevent liquids from going up into the nose, that is, he says the uvula closes in part the upper air passage; that in some cases its removal might tend to cause choking or strangling in swallowing foods, tho the witness, on cross-examination, said he could not say that the uvula was necessary in the act of swallowing; that there is a possibility that food might lodge in the pharynx and cause strangulation when the uvula is gone. He says that the uvula is often removed in general practice and whether it is removed when tonsils are taken depends on its condition. He says: "In many instances the surfaces closely adjacent to the tonsils are in infected tonsils usually badly inflamed, including the uvula. In certain classes of diseases and under certain circumstances it might be necessary to remove the entire uvula." Again he says: "The presence of a diseased tonsil would have an influence upon the health of the uvula and there is a relation between the two in that way and I would expect to find a more or less diseased uvula where you have a diseased tonsil." Under ordinary conditions, he

50 N. D.—7.

says, a person using ordinary care would not remove the uvula when removing tonsils or adenoids. There is no evidence as to whether the conditions were "ordinary" in this case. There is no chance or danger ordinarily, he says, that one removing adenoids would also remove the uvula. The tonsils are nearer the uvula and therefore it seems that there is a greater probability that the uvula might be removed during a tonsilotomy operation.

The mother of plaintiff testified that during the operation in defendant's office the girl apparently was not under complete anaesthesia and that she was striking with her hands and trying to struggle against the operation. The unmistakable inference from her testimony and to some extent of that of the daughter herself is that the surgeon who operated negligently failed to completely anaesthetize and for that reason the girl, partly conscious during the operation, struggled and had to be held. Inasmuch as the charge of negligence is not based upon lack of skill in the actual removal of the tonsils or the adenoids, the purpose of this testimony undoubtedly was to show the probability of accidental removal of the uvula at the time the tonsils were removed, because the patient was partly conscious and not wholly quiet. The most that can be said with reference to this testimony is that it constitutes a circumstance which, with other facts, might tend to show that the uvula was accidentally removed because the surgeon negligently failed to completely anaesthetize the patient.

Dr. Johns further testified that he could not say, either from his experience or from the textbooks, to what extent the uvula was a necessary organ. He said he assumed it had some function because otherwise it would not be a part of the human anatomy, but what its function is he did not undertake to say specifically, except as indicated heretofore.

The defendant denied he ever performed any operation whatever on plaintiff, or even ever saw her before. There is substantial evidence from which the jury could find against him on this point and we shall not take time to discuss this further. He called two experts who testified in his behalf. One of them, Dr. McCannell, is a specialist in eye, ear, nose and throat diseases, who has been practising in Minot since 1907 and who has performed on the average five hundred adenoids operations per year since. He testified that he examined the

girl's throat and found it in good functioning condition; that the uvula was often removed by people who trained voices, in order to improve the sounding board quality of the palate, and that it is often beneficial to remove it; that he had never seen any injurious effects from the removal of the uvula; that the uvula had no function in articulation and its removal has no tendency to impede swallowing; it has none but a remote connection with the eardrum and its removal could not cause earache; the removal of the uvula could not in the least affect the girl's health or her voice; the uvula has nothing to do with swallowing; there are no injuries in the soft palate; ordinary mouthfuls of food wouldn't touch the uvula. When the uvula becomes diseased, it is removed entirely. It has no function in voice production. The uvula wont prevent particles of food and water from going up into the pharynx, but the soft palate will. The witness further testified that his observation was corroborated by clinical experience; that the uvula hangs there as a useless appendage and is of no use in the human body. There is no physical basis whatever for the difficulty in swallowing in this case and the witness concluded that the girl was shamming and trying to deceive him. The difference of tone in the voice would be accounted for in the same way as the witness' voice was different from that of the examiner. There is no injury. Food going up the wrong way would not choke or strangle but would cause a slight burning sensation. He never heard of any body injured by food or water going up into the nose. Food particles or water passing upward frequently would not have any effect on the ears or cause pressure on the eardrums or cause earache. Earache is caused by retention of fluid in the middle ear cavity. The witness stated that his own daughter, a girl of twelve years had had an operation for the removal of the uvula with no bad effects whatever.

Another expert witness who testified for the defendant was Dr. Erenfeld, a physician and surgeon of Minot, engaged in general practice. He states that there is much difference of opinion as to the function of the uvula and that he personally did not know that it had any function; that he had seen patients frequently with the uvula removed, but never one in any way impaired; that there was no condition in the mouth of the plaintiff that would interfere with her swallowing, nor would the removal of the uvula have anything to do with swallowing,

so as to produce any of the symptoms which the witness observed in the plaintiff on the morning of the day when the testimony was given. He says, in substance, that the girl has no pains although she claims to have and that her condition is hysteria; to talk constantly about the matter for some years would produce a condition of mind that would aid in producing the symptoms noted and that the condition is not permanent, assuming that it is pretended. He says further that they couldn't find any books that had anything about the function of the uvula, altho he searched at the request of counsel for the plaintiff. He said that he would call the condition hysteria rather than sham, giving the girl the benefit of the doubt. He says strangling will not cause earaches, nor will food going up into the nose through the pharynx. There is nothing to improve there and no disease of any kind.

Such is the substance of the expert testimony in the case. The experts testifying for the defendant explicitly and specifically state that the removal of the uvula would not cause the condition described by the plaintiff and her mother and that the removal of the uvula would not be attended by any injurious consequences; all the experts say that it is proper to remove a diseased uvula and the record shows that a diseased uvula is sometimes found with diseased tonsils.

In the absence of evidence to the contrary, the law presumes the exercise of a reasonable degree of care and skill by a physician and surgeon; 21 R. C. L. 406; Houghton v. Dickson, 29 Cal. App. 321, 155 Pac. 128, citing, State use of Janney v. Housekeeper, 70 Md. 162, 2 L.R.A. 587, 14 Am. St. Rep. 340, 16 Atl. 382; Staloch v. Holm, 100 Minn. 276, 9 L.R.A.(N.S.) 712, 111 N. W. 264; Haire v. Reese, 7 Phila. 138; Spain v. Burch, 169 Mo. App. 94, 154 S. W. 172; and that the defendant was innocent of wrong. Comp. Laws, 1913, Subd. 1, § 7936. Nor would the fact that defects appeared after the operation or treatment, unless of such a character that negligence must be assumed from their unexplained presence, which is not the case here, constitute evidence of negligence. 30 Cyc. 1584, 1587; Stoskoff v. Wicklund, 49 N. D. 708, 193 N. W. 312; Inglis v. Morton, 99 Wash. 570, 169 Pac. 962; Sawyer v. Berthold, 116 Minn. 441, 134 N. W. 120; Zoterell v. Repp, 187 Mich. 319, 153 N. W. 696. The maxim res ipsa loquitur has no application. 21 R. C. L. 406; McGraw v. Kerr, 23 Colo. App. 163, 128 Pac. 870; Miller v. Blackburn, 170

Ky. 263, 185 S. W. 864; Ewing v. Goode (C. C.) 78 Fed. 442. Negligence will not be imputed to a physician without evidence or proof thereof. Levy v. Vaughan, 42 App. D. C. 146; Spain v. Burch, 169 Mo. App. 94, 154 S. W. 172; Sheldon v. Wright, 80 Vt. 298, 67 Atl. 807; Marchand v. Bellin, 158 Wis. 184, 147 N. W. 1033.

It is undoubtedly the duty of the plaintiff to establish by a preponderance of the evidence that the condition complained of by her was caused by negligence of the defendant and, therefore, it became incumbent upon her to trace a causal connection between the ailments detailed and the loss of the uvula. The evidence upon this point has been set forth and is not of the most convincing or satisfactory character from the standpoint of the plaintiff. We are not prepared to say, however, that the testimony of the expert witness for the plaintiff was not sufficient to create a conflict and, inasmuch as the jury has found upon that testimony in favor of the plaintiff, as far as the resulting injuries and the damages are concerned, we are not prepared to say that there is no substantial evidence in the record to support the finding of the jury in this regard.

Complaint is made of the instructions of the trial court, with reference to the weight of expert testimony. The court said, in substance, that expert testimony was not binding upon the jury but that the jury were at liberty to give it such weight as they deemed it fairly entitled to. There was conflict in the expert testimony upon matters beyond the province of lay witnesses to explain or understand. It may be that the instruction is open to criticism but, on the whole, we think it fairly submitted to the jury the proposition that the weight of the evidence was for them and that as between conflicting evidence, expert as well as otherwise, the jury must decide.

This is not a case where all the expert evidence is one way upon technical matters wholly beyond the knowledge or experience of ordinary witnesses. A case may be conceived where it would be improper for the jury to disregard expert testimony. In the case of Relater v. Strain, 39 Okla. 572, 50 L.R.A.(N.S.) 880, 137 Pac. 96, however, experts testified unanimously that the removal of the sesamoid bone from the foot could not cause injury because the bone served no useful purpose. The fact was, however, that the experts had not in their experience seen this bone in the position it was found, that the foot was

deformed and the joint stiff after the operation and the foot was exhibited to the jury. The court held that the evidence of experts, in this respect, tho unanimous and undisputed, was not conclusive on the jury. In the case at bar, all the experts admit that much doubt and uncertainty exist among medical men as to the function, if any, of the uvula. Neither is the jury required to believe the testimony of defendants as to the conditions found to exist. Fausette v. Grim, 193 Mo. App. 585, 186 S. W. 1177. See also Browning v. Hoffman, 90 W. Va. 568, 111 S. E. 492, where instructions similar to those in the case at bar were approved by the court.

It is true that authorities may be found holding that the jury may not, in certain cases, disregard uncontradicted expert testimony, Bennen v. Parsonnet, 83 N. J. L. 20, 83 Atl. 948; and that upon certain questions expert testimony is necessary to support the verdict; Hunter v. Burroughs, 123 Va. 113, 96 S. E. 360; Ewing v. Goode (C. C.) 78 Fed. 442; Berkholz v. Benepe, 153 Minn. 335, 190 N. W. 800; Holsapple v. Scofield, 176 Wis. 649, 187 N. W. 682. We do not decide in this case that there may not be instances where a jury would not be justified in disregarding uncontradicted expert testimony. All we decide is that the case at bar does not call for the application of that doctrine, nor for a discussion of that question.

Error is predicated upon the attempted impeachment of Dr. McCannell, one of the witnesses for the defendant. On September 19, 1919, this witness had examined the plaintiff and at the time made a record of the history of the case as given by the father of the plaintiff in his office. This was done according to his custom in all cases. He saw a prior operation had been performed and obtained from the patient and her guardian information as to when and by whom it had been performed. These facts he put on a card in the usual way. The examination in chief was on this point confined to these matters as a foundation for introducing the card record in evidence. The evident purpose of this examination was to show that plaintiff at that time asserted that a physician, other than the defendant, had removed the tonsils, which statement appeared on this card record. He was, on cross-examination, asked by counsel for the plaintiff if he had not on that occasion looked into the girl's throat and said, in substance, that it was an "awful job" and that it was "a wonder she could swallow at

all." No evidence was produced to show whether the alleged remark was made with reference to the removal of the uvula or the adenoids or tonsilotomy operations, or all of them. He had said in the examination in chief that he found that the upper parts of the tonsils had been removed as well as the adenoids. For aught that appears in the record, the alleged remark was made with reference to the general condition of the throat. The witness denied making any such statement. This alleged conversation was not touched on in the examination in chief and the alleged expression of opinion had no connection with the history of the case as obtained by the witness at the time; nor had the witness intimated any opinion as to the condition of the throat at that time, due to the negligent or skillful character of the prior operation. State v. Schonberg, 24 N. D. 532, 538, 140 N. W. 105. Thereafter, plaintiff sought to impeach him by proving that he did, in fact, make such statements and called for this purpose the father of the plaintiff and the plaintiff herself, both of whom testified, over objection, that the statements were made. This we believe was prejudicial error. If the contradictory statement, alleged to have been made by the witness McCannell, had reference to the general condition of the throat, due to the fact that the tonsils and adenoids had been removed, or due to the manner in which the tonsils and adenoids had been removed, it was wholly irrelevant to any issue in this case and was, accordingly, improper for the purpose of impeachment. No negligence is alleged based upon the adenoids or tonsilotomy operations per se. Becker v. Cain, 8 N. D. 615, 80 N. W. 805. The questions were upon immaterial and collateral matters and the answers were conclusive against the party asking them. Ibid.; People v. Johnston, 186 App. Div. 248, 174 N. Y. Supp. 366; State v. Haynes, 7 N. D. 70, 72 N. W. 923; 40 Cyc. 2701, 2702. The effect of this testimony was, moreover, to make the alleged statement of Dr. McCannell substantive evidence against defendant, tending to show malpractice in the operation on the girl's throat. As to the defendant, that statement was unsworn, was purely hearsay and would not be admissible. This was therefore an effort to introduce hearsay testimony indirectly and to give it probative force. Materka v. Erie R. Co. 88 N. J. L. 372, 95 Atl. 612.

The court further committed error, in connection with this testimony, in submitting to the jury the preliminary question of whether

or not a foundation had been laid for the impeachment, by showing that the alleged contradictory statement was made with reference to the removal of the uvula or the uvula operation. Ordinarily, preliminary questions as to the admissibility of evidence are questions of law for the court and should not be submitted to the jury, unless there be a dispute in the testimony of witnesses, brought out during their examination, as to the existence of the necessary preliminary facts. King v. Hanson, 13 N. D. 85, 103, 99 N. W. 1085. Such is not the situation here. There was no evidence whatever before the court to the effect that the alleged contradictory statement had reference to the only issue in the lawsuit, namely, the alleged negligent removal of the uvula. There was, therefore, nothing to submit to the jury and, no foundation having been laid, the evidence should have been excluded. 38 Cyc. 1513, 1514; Guinn v. Phœnix Ins. Co. 80 Iowa, 346, 45 N. W. 880; Thomp. Tr. §§ 318–338; Tarver v. State, 137 Ala. 29, 34 So. 627. This exception to the general rule that the court must decide the preliminary facts and the jury the ultimate facts, applied by this court in King v. Hanson, supra, has been criticised by some text writers and courts with some plausibility. Wigmore, Ev. § 2550. We do not think the exception should be enlarged. It has no application to the facts in this case.

Dr. McCannell was a very important witness; he is a specialist in eye, ear, nose and throat diseases and his testimony upon technical questions of medical practice in his specialty would, by reason of his experience, ordinarily be entitled to careful consideration by the jury. There is no doubt that this impeachment of his testimony upon a collateral matter, by showing a contradictory statement to have been made by him, tended to create the impression in the minds of the jurors that he was biased, probably untruthful and, therefore, an unreliable witness.

Error is also predicated upon the admission in evidence of claims against McHenry county, presented by the defendant for services rendered charity patients during the period from January 1 up to September or October, 1915, upon the ground that this evidence was admitted for the purpose of impeaching the defendant on collateral matters. We think that this evidence, with proper foundation, would be admissible for the purpose of rebutting the claim of the defendant that, during

this period he was, because of an injury to his arm, disabled from performing surgical operations and from practicing his profession, except perhaps the waiting of prescriptions.

Counsel for the appellant claims that the verdict is grossly excessive. It is true that the evidence of injury is not very satisfactory, but this question is not before us. A motion for a new trial upon the ground that the verdict was excessive was not made. Comp. Laws 1913, § 7660. The verdict was not in any manner challenged in the court below and the finding of the jury as to the amount of the damages is binding in this court. Swallow v. First State Bank, 35 N. D. 608, 161 N. W. 207.

Numerous other errors are assigned, but we do not deem it necessary to notice them further.

The judgment is reversed and new trial ordered.

BIRDZELL, NUESSLE, and CHRISTIANSON, JJ., concur.

BRONSON, Ch. J. (dissenting). The record in this case is voluminous. A week was consumed in the trial. The transcript of the proceedings covers over 500 pages. The majority opinion reverses the judgment and orders a new trial upon two grounds. First, that primarily error occurred in permitting the introduction of a contradictory statement for purposes of impeachment. Second, that secondarily error occurred in submitting to the jury the preliminary question concerning the application of such contradictory statement. Otherwise, the majority opinion upholds the validity of the proceedings had and the sufficiency of the evidence to warrant recovery. The objectionable testimony for which reversal is had, through the majority opinion, occupies a few lines in the long transcript of proceedings. Robert Schmidt, the father of the girl for whom damages are claimed, was called in rebuttal. He testified that he had a conversation with Dr. McCannell in the presence of his wife and daughter at the office of the doctor some three years previous. Dr. McCannell asked him "Who did this?" (Referring to a previous operation.) He replied, "Dr. Stone." Then follows the objectionable testimony.

"Q. What did Dr. McCannell say?"

"A. It is a rotten job."

"Q. Did Dr. McCannell at that time say to you 'It is a wonder your daughter can swallow at all. ?' "

"A. Yes, sir."

"Q. Now did Dr. McCannell look into the throat of your daughter at that time and call in the nurses into his office and show them the throat at that time ?"

"A. Yes, sir."

"Q. Did he, in substance, after he had called the nurses in say, 'Aint it awful ?' "

"A. Yes, sir." (pages 453 to 456.)

Louise Schmidt, the daughter for whom damages are claimed, in rebuttal testified that she heard her father tell Dr. McCannell that Dr. Stone had performed the operation. She did not testify in rebuttal that Dr. McCannell said it was a rotten job or that it was a wonder that she could swallow at all. This testimony, together with the testimony adduced upon cross-examination from Dr. McCannell, is made the basis for a reversal upon the ground that it was an attempt to impeach the doctor, who was an expert witness for the defense upon a collateral matter. Of course, if this rebuttal testimony did not concern a collateral matter and was properly admissible, then the submission of the preliminary question to the jury concerning the same was within the discretion of the trial court and was not error. King v. Hanson, 13 N. D. 85, 103, 99 N. W. 1085. A brief review of the record proceedings must be made in order to comprehend the application of the impeachment questions to the issues and evidence involved.

The complaint alleges, among other things, that the defendant doctor, in June or July, 1915, was employed as a physician and surgeon for the purpose of performing an operation for the removal of tonsils and adenoids; that, in the performance of the operation upon the throat of the girl, then aged eight years, the doctor negligently and carelessly removed the uvula from the throat and mouth of the girl and negligently and carelessly maimed, disfigured and injured her; that he negligently and carelessly removed such uvula without the consent and authority of the plaintiff or any person in her behalf; that he entered upon the employment to perform the operation for the removal of adenoids and tonsils from her throat but that he performed such operation in such an unskillful, careless, and negligent manner that he removed the uvula from

her mouth and throat to her damage, etc. To this complaint the defendant doctor interposed an answer generally denying all of the allegations of the complaint excepting that he was a licensed physician and surgeon. He specifically alleged that he had no recollection or knowledge of ever having been employed by the plaintiff or of having performed any surgical operation upon her throat for the removal of tonsils or adenoids or otherwise, and he specifically denied the performance of such operation. Further, he alleged, without admitting the performance of the operation, that if he did perform the same it was done properly, skillfully and carefully. He further specifically denied that she was injured and damaged in any way thereby. It will be seen, therefore, that the specific issues as framed were, *first,* whether the defendant doctor performed the operation, or any operation, on the plaintiff girl; and, *second,* if he did so perform an operation for the removal of tonsils and adenoids, whether he negligently, or carelessly or without an authorized consent, removed the uvula so as to be liable. In the record much testimony was adduced in proof of, and denial of, the performance of an operation by the defendant doctor. The mother of the plaintiff girl testified that she knew Dr. Stone. Some years previously she had consulted him. In 1915 she went to him with her daughter Louise. Her daughter was not then sick but she thought she was in good condition for having *her adenoids* removed. She saw the doctor and told him what was the matter with the girl; that she had to have *her adenoids* removed and she went in time so that it would be all right before school started. Then he got ready for the operation and took the girl up in the operating room. She took her to Dr. Stone to have *her adenoids* removed. She knew her daughter needed an operation *for adenoids* because it seemed to be hard for her to breathe; to trouble her when she had a cold. Before this time she had taken her daughter to Dr. Moeller who had examined her tonsils. Dr. Moeller also examined her adenoids. He asked her to wait until she got in good condition. She got medicine from Dr. Moeller. She thought she would rather go to Dr. Stone. Concerning the question whether the tonsils were to be removed in Dr. Stone's office, she testified "That is one operation, isn't it? They do both." Concerning the fact that adenoids and tonsils are entirely different things, she testified "I know that, but they cut them out at the same time." When she went to Dr.

Stone's office she liked to have *the tonsils* removed, too. "We thought he could take care of her." The daughter Louise testified that she and her mother went to Balfour to see Dr. Stone for an operation *for tonsils;* that she knew Dr. Stone and he operated upon her. The defendant denied performance of this operation. He asserted that he never saw the mother of the plaintiff before. He adduced evidence to show his physical inability at the time of the operation, through an accident, to perform the same.

Dr. Stone, when called for cross-examination under the statute, testified that the adenoids are between the nose and the mouth and the back part of the throat. He does not know how for the distance between the uvula and the tonsils but it is not an inch. It depends on how long the uvula is. Adenoids accumulate above and back of the uvula. The uvula is a part of the sofe palate. He does not know what the function of the uvula is. When you remove tonsils, you remove tonsils and not the uvula. When you remove adenoids, you remove adenoids. It would be *improper to remove the uvula in an operation for adenoids and tonsils. He knows he would not do it.*

Dr. McCannell was an expert witness for the defense. His testimony occupies some 88 pages of the transcript of the evidence. He is an eye, ear, nose, and throat specialist with a wide and extensive practice at Minot since 1906. At the trial he examined the girl to see the condition of her tonsil area and her upper pharynx. He made such an examination that he knew the condition of that area and also of her throat. He knew the girl. She was in his office in September, 1919. The trial was had commencing January 31st, 1922. At that time, in September, 1919, he made an examination of this girl's throat and mouth. He found that the lower poles of both tonsils, that is, the part of the tonsils down near the tongue or at the base, were in a diseased condition and he remedied that condition by removal. The upper portion of the tonsils then were entirely gone. It is his custom to make a record concerning every patient; to secure a history of the case. It is his custom to write down everything they tell him which is important to the case. He did that in this case and produced his record. He got the history of the case from her father, Robert Schmidt, her guardian in this case. On this record there appears language to the effect "had tonsils removed six years. Moeller." It

was the doctor's practice to ascertain who had done any previous operations. The word "Moeller" indicated that Dr. Moeller had performed the previous operation of removing the tonsils. There was also a sort of pencil sketch of the mouth upon this record card. This card also disclosed that the uvula was gone and that there was a scar in the soft palate. The doctor says that the uvula might be considered a very small portion of the sofe palate; that the soft palate is still there, intact, with the exception of the uvula. Upon cross-examination the doctor testified that the father, with this little girl, came to his office. He has no recollection of the woman, that is, the mother, being there. (She testifies that she was there; that her husband told the doctor that Dr. Stone had operated.) He first had a conversation with these persons. He has no independent recollection that he can recall of any conversation that took place at that time. Mr. Schmidt, the father, did the talking. He had nurses there in a hospital upstairs. At the time of the examination he did not call in these nurses and tell them to look at this little girl's throat. It might have occurred in the operating room but not in the office. Then upon cross-examination he was asked several questions concerning the inquiries that he made about this little girl's condition. Then he was asked the following question:

"Q. Did Mr. Schmidt not say to you then when you asked 'Who did this?' 'Dr. Stone,' and did you not say, 'That is an awful job?' "

"A. If he said Dr. Stone it would have been on the record."

"Q. I did not ask you that."

"A. Then he didn't say that."

"Q. Did you say that?"

"A. I did not."

"Q. And you had no independent recollection of having said that?"

"A. No, I never said that." (223)

He further explained that he did not make any notation of this fact that she had had adenoids because in practically every case of diseased tonsils in a child of that age, there are adenoids as well. Then he was asked the question:

"Q. Did you say anything to this patient at that time in regard to her swallowing?"

"A. I can not recall definitely."

"Q. Did you not say to Mr. Schmidt, in substance, that you wondered at her being able to swallow?"

"A. No, I don't remember that."   (224)

No objection was made by the defense to these questions and answers. They were received without objection. Further, upon cross-examination, this doctor testified that he discovered an unnatural condition in the examination that he made. The lower poles of the tonsils were still there. The upper and middle portions of the tonsils had been removed, the lower part, not at all. He looked at the time at the place where the uvula ought to be. It was gone. He noticed no injuries to the soft palate itself. There might have been some scars on it. The witness took the card and before the jury, using the plaintiff as an exhibit, he showed where the scar was. He indicated on the patient the place where the scar was at the time she came to his office. He pointed out pillars that extended down to the tongue; also the soft palate there; also that the small portion of the soft palate which was adhering to the anterior pillar was scarred: that the scar is not there now. He removed it. There is no scar on either side and no remains of tonsils. Otherwise, in his evidence the doctor explained the function of the uvula and the methods of operation in removing tonsils and adenoids. From the result of the examination made before and after the trial he stated that the throat of this little girl was in good condition; that it showed evidence of the previous operation but at the present time, with the exception of the absence of the uvula, the throat seemed to be a good functioning throat. He testified that the uvula is frequently removed, ofttimes with beneficial results; that it has a tendency to become inflamed easily and swollen up like the tonsils; that he has never seen a case of removing of uvula with any injurious effect; that it is often removed to prevent recurrent inflammation with no bad results; that, in general, the removal of the uvula would not cause headache or inhibit the action of swallowing; that the removal of this uvula from this girl's throat did not, in his opinion, in the least affect her health; nor has it affected her voice; that the removal of the uvula has no detrimental effect whatever; that, in operations, there is more danger in removing accidentally the uvula in a tonsil operation than in an adenoid operation. The doctor further testified that he did not consider that the uvula performed any function. He has come to

the conclusion that the girl is shamming and trying to fool him. Concerning the scar that he observed on the soft palate, he considered it a very superficial wound but such a scar as he thought it advisable to make a note of. Further, he testified that he observed the general physical appearance, size and condition of this girl and he found no evidence of any malnutrition of the body; that she was a pretty good sized girl for a girl of her age. Finally, at the conclusion of his examination, counsel for defense asked him this question: —

"Q. From the examination of this young lady's throat, do you find there is anything in the formation or condition of her nose and mouth and throat at the present time that would hinder her eating any old kind of solid foods?"

"A. I can't see it?" (274)

The majority opinion finds that the testimony of Dr. Johns, the expert for the plaintiff, was sufficient to establish a causal connection between the loss of the uvula and the complaints and physical condition testified to by plaintiff and her mother. It is unnecessary, consequently, to state or review the expert testimony of Dr. Johns and the physical condition or defects of plaintiff as shown in the evidence.

The majority opinion states that no negligence is alleged based upon the adenoids or tonsilotomy operations per se. If the plaintiff was able to establish to the jury's satisfaction that the defendant performed the operation, the gist of the action then was whether the defendant negligently, or carelessly, or without authorized consent, removed the uvula, and whether the plaintiff was damaged thereby. This is an action for malpractice. It is founded on a contract though sounding in tort. 30 Cyc. 1538. Dr. McCannell was a very important witness, an expert, for the defense. His testimony was of strong probative force, not only to show that the defendant did not perform the operation but also, if he did, that the removal of the uvula when the tonsils are removed is a proper thing for a skillful physician to do and is not a negligent and careless act; that, furthermore, the removal of the uvula occasions no damaging results; that, on the contrary, it is beneficial, since the uvula is a useless appendage serving no function and being subject to inflammation. Very readily, from the testimony given by Dr. McCannell through the opinions that he gave by his direct knowledge of his own operation, of his examination of the girl in 1919,

and at the trial, the jury had presented for its consideration strong testimony to the effect that the removal of a uvula was neither a negligent nor careless act; that, in fact, its removal served beneficial purposes; that, in fact, there was nothing wrong with the girl in 1919 when he examined her excepting the diseased lower poles of her tonsils and the scar on the soft palate which he then remedied and corrected by removal; that there is nothing wrong with her at the present time so far as a good functioning throat is concerned; that furthermore, she is well nourished; that she can swallow any sort of solid foods and that in fact she is shamming. In other words, touching the gist of the action, the doctor's testimony as an expert is to the effect that the removal of a uvula in a tonsilotomy operation is neither a negligent nor careless act; that, if done without consent, no damages have been occasioned; rather, beneficial results have occurred. His testimony, in general effect, gave to the girl a clean bill of health at the time of the trial regardless of the operation performed by the defendant and by himself. On the contrary the plaintiff presented testimony through an expert and otherwise that the functioning of the girl's throat through and after this operation by the defendant doctor had been seriously impaired. It may not be predicated upon this record that Dr. McCannell through his operation in removing the lower poles and the scar on the soft palate was unskillful, negligent, or was in any manner the cause of plaintiff's present condition. No claim in that regard is made.

But the majority opinion asserts, concerning the contradictory statements made by this expert, that there is no evidence to show that such remarks had reference to the removal of the uvula; that they might refer to the general condition of the throat, or to the operation for the adenoids, or tonsils; that the evidence fails to show that such contradictory statements had reference to the only issue in the lawsuit, namely, the alleged negligent removal of the uvula; that accordingly, no foundation having been laid, the evidence in rebuttal to show such contradictory statements should have been excluded. The issues concerning this question, as heretofore stated, related to a careless, or a negligent, or an unauthorized, removal of the uvula and also to the question of whether plaintiff had been damaged. The issues were broader than a question of negligent removal. A negligent removal, an accidental removal, an unauthorized removal, as well as the question of any damages, were involved. In view of the issues as above stated and in view

of the direct consideration that this expert gave to these issues by his testimony, it appears, in my opinion, that it is a splitting of hairs to infer that his contradictory statements might have referred to the removal of the adenoids or the tonsils. In this regard it is to be noted that Dr. McCannell made a notation on his card that the uvula was removed. He noted that there was a scar on the soft palate. He noted that a previous operation upon the tonsils had been performed. He knew that the adenoids had been removed. The patient was before him for examination in 1919 to then submit to an operation to remedy existing conditions then in her throat. He made the examination for that purpose. He remedied the condition existing by an operation. That operation did not cover any operation upon the adenoids, or upon the middle or lower poles that the defendant doctor had operated upon before. It consisted of an operation of the lower poles of the tonsils and of the removal of the scar where the uvula had been. Surely, if the "awful job" that he mentioned had reference to the operation for adenoids or for tonsils, the doctor would have remedied this "awful job" on the tonsils and on the adenoids. Properly, accordingly, it was for the jury to say whether or not he was of a different opinion in 1919 about taking out the uvula than he was in 1922 before the jury when he said that the taking out of a uvula was a proper and beneficial thing to do. It was not a collateral matter; a proper foundation had been laid. It was well settled that if there is any inconsistency between the belief of a witness concerning certain matter as indicated by his previous declarations and that which would naturally be indicated by his testimony, such prior declarations may be shown although not directly contradictory of any specific statement made on his examination. 40 Cyc. 2704; Handy v. Canning, 166 Mass. 107, 44 N. E. 118; Whipple v. Rich, 180 Mass. 477, 63 N. W. 5; McClellan v. Ft. Wayne & B. I. R. Co. 105 Mich. 101, 62 N. W. 1025. In my opinion such statements of this expert, if made in 1919, were directly contradictory to his evidence and opinions in a vital matter in issue before the jury, namely, the question whether the removal of the uvula was negligently or carelessly done; or, if done without consent, whether or not benefits flowed therefrom instead of damages. Concerning unauthorized operations see 30 Cyc. 1577; notes in 50 L.R.A.(N.S.) 880, and Ann. Cas. 1916C, 1107. The judgment should be affirmed.